IN RE: Craig L. BERKMAN, Debtor.

Langdale Capital Assets, Inc.,
et al., Plaintiffs,

v.

Susan K. Woodard, et al., Defendants.

In re: Synectic Asset Management,
Inc., Debtor.

Susan K. Woodard, et al., Plaintiffs,

v.

Langdale Capital Assets, Inc.,
et al. Defendants.

Case No. 8:09–bk–05169–CED
Adv. Pro. No. 8:13–ap–336–CED
Case No. 8:09–bk–05172–CED
Adv. Pro. No. 8:13–ap–469–CED

United States Bankruptcy Court,
M.D. Florida,
Tampa Division

Signed September 29, 2014

Kevin W. Barrett, Rodney A. Smith, Bailey & Glasser, LLP, Charleston, WV, Roberta A. Colton, Tampa, FL, for Defendants Synectic Ventures I, LLC, Synectic Ventures II, LLC, Synectic Ventures III, LLC.

Jake C. Blanchard, Blanchard Law, PA, Largo, FL, William P. Langdale, III, Langdale Valloton, LLP, Valdosta, GA, Scott A. Underwood, Fowler White Boggs PA, Tampa, FL, for Plaintiffs JLD Properties, LLC, Langdale Capital Assets, Inc., Ferrell Scruggs, Jr., Patrick Robinson.

William C. Elliott, Elliott & Associates, PA, Gulf Breeze, FL, for Defendant Charles F. Faddis.

Lara Roeske Fernandez, Trenam, Kemker, et al, Tampa, FL, for Defendants Synectic Ventures I, LLC, Synectic Ventures II, LLC, Synectic Ventures III, LLC and Susan K. Woodard.

Paige A. Greenlee, C. Read Sawczyn, Sivyer Barlow & Watson P.A., Tampa, FL, for Defendant Alco Holdings, LLC.

Stephanie C. Lieb, Trenam, Kemker, Tampa, FL, for Defendant Susan K. Woodard.

Chapter 7

*ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT FILED BY THE TRUSTEE, THE SYNEC-TIC FUNDS, AND ALCO AND DE-NYING MOTIONS FILED BY LANGDALE PLAINTIFFS AND THE INVESTMENT GROUP*

Caryl E. Delano, United States Bankruptcy Judge

The primary question presented in these two related adversary proceedings is whether a Chapter 7 debtor's payments to the Chapter 7 trustee in settlement of disputed claims may be avoided as fraudulent transfers under the Florida Uniform Fraudulent Transfer Act ("FUFTA") by creditors who claim the payments are traceable to funds that the debtor fraudulently obtained from them. Because the Court finds that the Chapter 7 Trustee accepted the payments in good faith and for reasonably equivalent value, the Court concludes that the payments are not subject to avoidance under FUFTA or on other equitable grounds and will grant summary judgment in favor of the Chapter 7 Trustee and the parties to whom she distributed the settlement payments.

## I. *Facts*

### A. *The History of the Synectic Funds' Claims*

The facts are not in dispute. The Debtor, Craig Berkman ("Berkman"), is a law school graduate and a well-known political figure in Oregon, having previously run for governor of that state. Berkman formed a number of venture capital investment firms for the purported purpose of investing in start-up companies in the Oregon area, including Synectic Ventures I, LLC, Synectic Ventures II, LLC, and Synectic Ventures III, LLC (collectively, the "Synectic Funds"). Berkman conducted business through a management company, Synectic Asset Management Company, Inc. ("SAM"). As it turned out, the monies invested in the Synectic Funds were not used to develop start-up companies. Instead, Berkman diverted monies from the Synectic Funds and others in the process of running an elaborate Ponzi scheme.

In November 2005, Berkman, aware that creditors were about to take action against him, moved to Florida where he purchased a home for almost $4,000,000.00. In December 2005, he got married.[1] On December 20, 2005, the Synectic Funds filed a lawsuit in Oregon against Berkman and others. After being served with the complaint in that lawsuit, Berkman transferred title to his Florida home to himself and his wife as tenants by the entireties. In June 2008, the Oregon jury returned a verdict in favor of the Synectic Funds and against Berkman, SAM, and the other defendants. Shortly after the jury returned its verdict, Berkman transferred over 600,-000 shares of stock he owned in EVI Corporation to himself and his wife as tenants by the entireties. He also transferred nearly all the money he held in bank accounts to a bank account held as tenants by the entireties with his wife. In November 2008, judgment was entered against Berkman and SAM, jointly and severally, in favor of the Synectic Funds for compensatory damages of approximately $15 million and punitive damages against Berk-

---

1. Mrs. Berkman is not a debtor in this case.

man for $10 million and SAM for $4.7 million. In the meantime, Berkman continued to conduct business, forming new venture capital funds that he managed through SAM.

### B. *The Bankruptcies and the Global Settlement Agreement*

On March 20, 2009, the Synectic Funds, represented by the law firm Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A. ("Trenam Kemker"), filed involuntary bankruptcy petitions against Berkman and SAM, both of whom consented to orders for relief (the "Berkman Case" and the "SAM Case"). Susan Woodard was appointed as the Chapter 7 Trustee (the "Trustee") in both cases. The Trustee retained Trenam Kemker as special counsel.

In the Berkman Case, the Trustee filed objections to Berkman's claimed exemptions, including his claims that assets such as the Florida home, bank account, and EVI Corporation stock were exempt as tenancy by the entireties property.[2] The Trustee also filed an adversary proceeding against Berkman seeking to avoid and recover his transfers of those assets.[3] In addition, the Synectic Funds commenced two adversary proceedings against Berkman: one objecting to his discharge,[4] and the other to except their debt from discharge.[5]

In the SAM case, the Trustee filed an adversary proceeding against Berkman and Ventures Trust Asset Management, a company owned by Berkman, to avoid the fraudulent transfers by SAM of various management agreements,[6] and adversary proceedings against other Berkman entities, Synectic Asset Ventures, LLC, to avoid the fraudulent transfer of $295,000.00,[7] and Synectic Ventures V, LLC, to avoid the transfer of $50,000.00.[8]

The Trustee and the Synectic Funds, on the on the one hand, and Berkman and SAM, on the other, negotiated the resolution of all issues between them (the "Global Settlement Agreement"). The Global Settlement Agreement called for Berkman to pay a total of $4,750,000.00 to the Trustee (in installments) in exchange for the Trustee's abatement, and eventual dismissal, of the pending litigation against Berkman and SAM and the Trustee's sale of other estate assets back to Berkman. The settlement funds were to be divided equally between the Berkman and SAM Cases. The Synectic Funds, in consideration of the receipt of their *pro rata* share of the Trustee's distributions to unsecured creditors (which would include Berkman's $4,750,000.00 settlement payment), agreed to dismiss their adversary proceedings so that the balance of the debt owed to them by Berkman would be discharged. The Synectic Funds also agreed to pay $97,270.00 and transfer shares of stock in and unrelated company, Well Partner, to one of Berkman's companies.

Relevant to the issues in these adversary proceedings is Section 4.2 of the Global Settlement Agreement. Section 4.2 provides that if Berkman defaulted in payments or failed to satisfy the requirements of Section 4.5, the Global Settlement Agreement is terminated and of no further effect. Section 4.5 of the Global Settle-

---

**2.** Berkman Case, Doc. No. 50.

**3.** Adv. Pro. No. 8:09–ap–572–CED.

**4.** Adv. Pro. No. 8:09–ap–555–CED.

**5.** Adv. Pro. No. 8:09–ap–513–CED.

**6.** Adv. Pro. No. 8:09–ap–514–CED.

**7.** Adv. Pro. No. 8:11–ap–471–CED.

**8.** Adv. Pro. No. 8:11–ap–474–CED.

ment Agreement required Berkman's attorney[9] to

(i) certify that (a) the source of the Settlement Funds is compensation paid or to be paid to Mr. Berkman and is not from an investment fund which is managed for the benefit of third parties, and (b) the funding source has been given notice of the settlement approval objection/hearing process at least five business days in advance of the date of the hearing by the Bankruptcy Court, (ii) provide proof of such notice to the Bankruptcy Court confidentially and under seal, without access to such notice by the Trustee, and Petitioning Creditors [the Synectic Funds] or any other creditors, and (iii) seek and obtain a finding from the Bankruptcy Court that Mr. Berkman's fund-raising transaction that is the source of the Settlement Funds is a good faith transaction arising postpetition.[10]

In other words, rather than obtaining a certification from Berkman, who was known to have defrauded investors in the past, the Trustee required Berkman's attorney to conduct an independent investigation into the source of the funds. Section 4.5 contemplated that the identity of the funding source would remain confidential and not be disclosed to the Trustee or the Synectic Funds.

Pursuant to Fed. R. Bankr.P. 9019, the Trustee filed a motion with this Court asking for approval of the Global Settlement Agreement.[11] To satisfy the requirements of Section 4.5 of the Global Settlement Agreement, on May 21, 2011,

Berkman's attorney wrote a letter to John B. Kern, Esq., a Georgia attorney, and obtained his initials and countersignature to the letter. The letter advised Mr. Kern of the upcoming hearing on the motion to approve the Global Settlement Agreement and confirmed a telephone conversation with Mr. Kern, in which Mr. Kern represented that Ventures Trust Management, LLC ("VTM") was his client. The letter stated:

You indicated that [VTM] is the source of funds relative to payments that have been made under the Settlement Agreement. You advised that Mr. Berkman is serving as a consultant to [VTM], an entity in which he has no ownership. [VTM] established this consultation role with Mr. Berkman in the fall of 2010. [VTM] has delivered to Mr. Berkman consulting fees and/or has advanced funds for consulting fees to be paid based upon the progress of the various projects which are managed by [VTM]. These projects cover a variety of industries and include those with real, tangible structures and projects. You were very clear that none of the funds use[d] to pay any of the fees delivered to Mr. Berkman are derived from investors in [VTM] projects or from projects of funds that are managed by [VTM] for the benefit of third parties.[12]

Berkman's attorney filed a motion to file the letter under seal, which was granted without objection by the Trustee.[13] Upon review of the letter, this Court approved the Global Settlement Agreement and made a finding, the condition precedent to

---

9. Berkman's attorney was a long-standing practitioner before this Court.

10. Berkman Case, Doc. No. 115–1, p. 4; SAM Case, Doc. No. 61–1, p. 4.

11. Berkman Case, Doc. No. 115; SAM Case, Doc. No. 61.

12. Berkman Case, Doc. No. 219, p. 2; SAM Case, Doc. No. 207, p. 2.

13. Berkman Case, Doc. Nos. 126, 127; SAM Case, Doc. Nos. 85, 86.

Global Settlement Agreement, that Berkman was making the settlement payments from compensation to be paid to him arising from a postpetition good faith transaction.[14]

Berkman began making installment payments to the Trustee prior to the Court's approval of the Global Settlement Agreement. After the Global Settlement Agreement was approved, Berkman continued making payments, but he struggled to do so. Berkman's attorney repeatedly asked the Trustee to grant Berkman extensions of time to make the additional payments. During the year or so period that it took Berkman to complete the payments to the Trustee, Berkman's attorney sent at least twelve emails to the Trustee's attorneys indicating that the forthcoming settlement payments were from funds that Berkman himself had earned.[15] And Berkman's attorney filed an *Emergency Motion for Extension of Time to Fund Global Settlement*, representing that the monies to be paid to the Trustee constituted fees that Berkman himself had fully earned. The motion stated

> The Debtor has been working diligently in a volatile global economy to earn a significant amount of money in what is a relatively short time. The monies to be paid under the global settlement are for fees that have been fully earned by the Debtor.[16]

During this same general time period, the Synectic Funds learned that Berkman, on behalf of VTM, had filed a lawsuit against NuScale Power, Inc. ("NuScale"). In its complaint, VTM alleged that NuS-cale had tortiously interfered with VTM's prospective business relationship with Tangent Ventures LP ("Tangent"), an entity that Berkman had identified as a potential funding source for NuScale.[17] The complaint suggests that Berkman, through VTM, was entitled to substantial compensation for Tangent's providing financing to NuScale. The Synectic Funds' manager, Gerson Goldstick, testified at deposition that he researched Tangent and confirmed that Berkman had a relationship with Tangent.[18] This additional information confirmed the Trustee's and the Synectic Funds' understanding that Berkman did, in fact, have legitimate avenues of personal income available to fund the Global Settlement Agreement. And at this time, neither the Trustee nor the Synectic Funds knew time that VTM was the entity identified in the letter confirming the source of Berkman's funds. In light of the NuScale litigation, knowledge of the substance of Berkman's attorney's letter to Mr. Kern would have served to confirm their belief that the source of Berkman's funds was legitimate.

On May 9, 2012, Berkman made the final settlement payment of $3,243,027.00 to Trenam Kemker. On June 1, 2012, Trenam Kemker transferred the funds to the Trustee, who allocated them evenly between the Berkman and SAM estates.[19] Having received full payment of the settlement funds, the Trustee and the Synectic Funds took actions to consummate the Global Settlement Agreement. The Trus-

---

14. Berkman Case, Doc. No. 128, p. 3; SAM Case, Doc. No. 87, p. 3.

15. Exh. No. 108 (Note: References to exhibits are those provided by the parties to the Court under the *Notice of Filing Record Citations,* Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 89.)

16. Berkman Case, Doc. No. 162, ¶ 19.

17. Exh. No. 148.

18. Exh. No. 141, pp. 122–23.

19. Exh. No. 85.

tee filed a notice of withdrawal of her objections to Berkman's exemptions [20] and delivered to Berkman a Trustee's Bill of Sale that conveyed all of the Trustee's rights, title, and interest in and to all of the scheduled assets in the Berkman Case and SAM Case; the Synectic Funds moved for and obtained an order vacating the final summary judgment declaring their underlying $25 million judgment against Berkman to be non-dischargeable [21] and moved to vacate their underlying Oregon and Florida judgments against Berkman and SAM; and one of the Synectic Funds paid Berkman's company, Synectic Asset Ventures, LLC, $97,270.00 and delivered to it stock certificates representing 13,000 shares of Well Partner stock.

The Trustee also began to wind up the Berkman and SAM bankruptcy estates. On October 25, 2012, the Trustee filed her *Trustee's Final Report* in the Berkman Case, proposing distributions to unsecured creditors, after payments of administrative and priority claims, in the total amount of $2,193,800.46.[22] After court approval of the Trustee's Final Report,[23] on December 15, 2012, the Trustee distributed the funds to creditors, including to Alco Holdings, LLC ("Alco") and the Synectic Funds.[24] And, on March 8, 2013, the Trustee filed her *Amended Trustee's Final Report* in the SAM Case, stating that she holds a total of $2,433,318.29 for distribution to creditors.[25] As set forth below, these funds have not yet been distributed.

### C. *Criminal Charges Against Berkman*

On March 15, 2013, the United States Attorney for the Southern District of New York filed a criminal complaint against Berkman and a warrant was issued for his arrest. Shortly thereafter, Berkman was arrested and charged with securities fraud and wire fraud. The charging documents alleged that between December 2010 and March 2013, Berkman, through various entities which he controlled, including Ventures Trust II, LLC ("Ventures Trust II") and Face–Off Acquisitions, LLC ("Face Off"), had fraudulently obtained over $13,200,000.00 from approximately 120 investors. The U.S. Attorney alleged that Berkman lured investors into yet another fraudulent scheme by representing that Ventures Trust II offered a unique opportunity to purchase discounted shares of Facebook, Inc., and that investments in Face Off would be used to acquire over one million pre-IPO (initial public offering) shares of Facebook.[26]

The Securities and Exchange Commission made similar allegations against Berkman, including an allegation that Berkman used the newly defrauded investors' funds to make the payments to the Trustee.[27] The SEC also identified a third fraudulent investment vehicle controlled by Berkman, Assensus Capital LLC ("Assensus"), which promised investors significant profits based on Assensus' acquisition of equity interests in cutting-edge technology companies.

**20.** Berkman Case, Doc. No. 170.

**21.** Adv. Pro. No. 8:09–ap–513–CED, Doc. Nos. 48, 52.

**22.** Berkman Case, Doc. No. 182.

**23.** Berkman Case, Doc. No. 184.

**24.** Berkman Case, Doc. No. 201, Form 2.

**25.** SAM Case, Doc. No. 165.

**26.** It was public knowledge that Facebook planned an initial public offering. *See http:// www.cbsnews.com/news/facebook-poised-for-ipo.*

**27.** Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 110–1, ¶¶ 28–29.

Berkman pleaded guilty to the criminal charges and is presently incarcerated in New York. As a result of the criminal charges, the United States Trustee also filed an adversary proceeding in Berkman's bankruptcy case to revoke his discharge.[28] Berkman did not defend that proceeding, and the Court entered an order revoking Berkman's discharge.[29]

### D. The Langdale Plaintiffs and the Investment Group

On April 19, 2013, Langdale Capital Assets, Inc., JLD Properties, LLC, Ferrell Scruggs, Jr., and Patrick Robinson (collectively, the "Langdale Plaintiffs") commenced an adversary proceeding in the Berkman Case seeking to avoid the transfers from Berkman to the Trustee, and the subsequent transfers from the Trustee to the Synectic Funds and Alco, as fraudulent transfers under FUFTA,[30] specifically Fla. Stat. §§ 726.105(1)(a), 726.105(1)(b), and 726.106(1) (the "Berkman Adversary").[31] In their amended complaint, in addition to the fraudulent transfer claims, the Langdale Plaintiffs also state claims for unjust enrichment and money had and received.[32] The Langdale Plaintiffs allege that they are victims of Berkman's most recent fraudulent investment scheme, having purchased membership interests in Face Off and Assensus. They allege that in April 2012, they wired funds in the collective total amount of $1,350,000.00 to a Face Off bank account and in June 2012, they wired additional funds in the collective total amount of $450,000.00 to an Assensus bank account. The Langdale Plaintiffs allege that Berkman used all or a substantial part of those funds to make the settlement payments to the Trustee.

Thereafter, 33 more victims of Berkman's fraudulent investment scheme (collectively referred to as the "Investment Group" and, together with the Langdale Plaintiffs, "Plaintiffs"), after being allowed to intervene in the Berkman Adversary, filed a third-party complaint in intervention.[33] The Investment Group alleges that from November 2010 through May 2012, its 33 individual members invested a total of $5,185,088.00 with Berkman by wiring funds into one or more accounts that he controlled. In their amended third-party complaint, the Investment Group asserts the same causes of action as the Langdale Plaintiffs.[34]

In the SAM Case, the Langdale Plaintiffs filed an emergency motion to vacate the Trustee's court-approved Trustee's Final Report.[35] The Trustee, who has not yet made distributions to creditors in the SAM Case, filed a complaint against the Langdale Plaintiffs for declaratory and injunctive relief, seeking a judicial determination that the Langdale Plaintiffs have no rights to property in the Trustee's possession and that the Trustee is authorized to make distributions to creditors (the "SAM Adversary").[36] The Langdale Plaintiffs

---

28. Adv. Pro. No. 8:13–ap–479–CED.

29. Berkman Case, Doc. No. 213.

30. Fla. Stat. § 726.101, et seq.

31. Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 1.

32. Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 109.

33. Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 62.

34. Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 91.

35. SAM Case, Doc. No. 168.

36. Adv. Pro. No. 8:13–ap–469–CED, Doc. Nos. 1, 45.

answered and counterclaimed on the same grounds they alleged in their amended complaint in the Berkman Adversary. The Investment Group sought and obtained leave to intervene in the SAM Adversary as defendants and counter-plaintiffs.[37] In a nutshell, the issues in the Berkman Adversary and SAM Adversary are identical.

## II. *The Instant Summary Judgment Motions*

The parties have each moved for summary judgment.[38] Plaintiffs contend that, on the undisputed facts, the payments from Berkman to the Trustee were fraudulent transfers subject to avoidance and recovery from the Trustee as the initial transferee and that the payments the Trustee made to creditors in the Berkman Case, including to the Synectic Funds and Alco, are subject to avoidance and recovery from them as subsequent transferees. The Trustee, the Synectic Funds, and Alco contend that the transfers are not subject to avoidance because they took the payments in good faith and for a reasonably equivalent value.

There is one area of disputed fact that the Court does not find necessary to resolve. The Langdale Plaintiffs rely on the affidavit of a certified public accountant[39] to establish that Berkman transferred $1,350,000.00 of the Langdale Plaintiffs' funds, wired by them to a Face Off account, to the Trustee as part of his settlement payment. Subsequent to the hearing on the summary judgment motions, the Investment Group filed an affidavit to es-tablish that the 33 members of the Investment Group invested a collective $5,258,400.00 with Berkman by wiring funds into bank accounts he controlled and that Berkman caused $2,709,306.00 of that amount to be transferred to his personal bank account.[40]

The Trustee filed a response to the Investment Group's affidavit, arguing that it is irrelevant because the Investment Group's members' funds are traced only to Berkman's account and not to the account of Trenam Kemker or the Trustee.[41] The Trustee further argues that even if the Court accepts the assertions regarding the tracing of the investments as true, they are immaterial to the Trustee's defenses of good faith and provision of reasonably equivalent value.

Because the Court finds that Plaintiffs cannot succeed on their claims for relief, the Court does not make a factual finding on the source of Berkman's payments to the Trustee, including (a) whether the source was, in fact, the Langdale Plaintiffs or the Investment Group's investments with Berkman, or (b) whether the source was investments by the other 90 or so defrauded investors who are not before the Court.

## III. *Legal Analysis*

### A. *Jurisdiction*

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a), and the Standing Order of Reference from the District Court. This proceeding is a core proceed-

---

37. Adv. Pro. No. 8:13–ap–469–CED, Doc. Nos. 31, 41.

38. Adv. Pro. No. 8:13–ap–336–CED, Doc. Nos. 94–98; Adv. Pro. No. 8:13–ap–469–CED, Doc. Nos. 75–78. Alco is a party only to Adv. Pro. No. 8:13–ap–336–CED.

39. Each. No. 150.

40. Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 122, ¶¶ 15–16.

41. Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 124.

ing under 28 U.S.C. § 157(b)(2)(A), (H), and (O), and the Court has authority to hear and determine the proceeding under 28 U.S.C. § 157(b)(1). To the extent the Court would otherwise lack the constitutional authority to enter a final judgment, the parties have consented to the Court's adjudication of this proceeding, including the entry of a final judgment, under 28 U.S.C. § 157(c)(2).

### B. *Summary Judgment Standard and the Burden of Proof*

Federal Rule of Civil Procedure 56(a), as incorporated by Fed. R. Bankr.P. 7056, authorizes the Court to grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. As explained below, the Court's ruling is based, in part, upon the good faith defense to fraudulent transfer actions provided for by Fla. Stat. § 726.109(1). While an inquiry into a party's good faith is ordinarily an issue of fact that would not be ripe for determination on summary judgment, the undisputed facts of this case, including the Trustee's objective efforts to ensure the legitimate source of Berkman's payments, permit the Court to conclude as a matter of law that the element of good faith has been satisfied.[42]

The ultimate burden of proof on an actual fraudulent transfer claim rests with the party seeking to avoid the trans- fer to establish by a preponderance of the evidence that the transferor effectuated the transfer in question with actual fraudulent intent to hinder, delay or defraud creditors.[43] Similarly, on a constructive fraudulent transfer claim, the party seeking to avoid the transfer must establish by a preponderance of evidence that the transferor received less than reasonably equivalent value in exchange for the transfer.[44] The party asserting a claim for unjust enrichment or money had and received also bears the burden of proof.[45]

### C. *Counts I–III: The Fraudulent Transfer Claims*

Plaintiffs' FUFTA claims are, first, that Berkman transferred the settlement payments with the actual intent to hinder, delay, or defraud creditors;[46] second, that Berkman transferred the settlement payments without receiving a reasonably equivalent value in exchange for the transfer while Berkman (i) was engaged or about to engage in a transaction for which his remaining assets were unreasonably small in relation to the transaction or business, or (ii) intended to incur, or believed or reasonably believed that he would incur, debts beyond his ability to pay;[47] and, third, that Berkman made the transfer without receiving reasonably equivalent value and either was insolvent at the time of the transfer or became insolvent as a result of the transfer.[48]

---

**42.** *See, e.g., In re Equipment Acquisition Resources, Inc.,* 2014 WL 1979366 (N.D.Ill. May 15, 2014) (granting summary judgment to transferee on issue of good faith defense under § 550(b)(1)).

**43.** *In re Dealers Agency Services, Inc.,* 380 B.R. 608, 612 (Bankr.M.D.Fla.2007).

**44.** *In re Vista Bella, Inc.,* 511 B.R. 163, 192–93 (Bankr.S.D.Ala.2014).

**45.** *Turner v. Fitzsimmons,* 673 So.2d 532, 536 (Fla. 1st DCA 1996); *Cullen v. Seaboard Air Line R. Co.,* 63 Fla. 122, 58 So. 182, 184 (1912).

**46.** Fla. Stat. § 726.105(1)(a).

**47.** Fla. Stat. § 726.105(1)(b).

**48.** Fla. Stat. § 726.106(1).

■ The first claim is generally referred to as an "actual fraudulent transfer," and the second and third claims are generally referred to as "constructive fraudulent transfer" claims. In order to prevail on her affirmative defense to the actual fraud claim under Fla. Stat. § 726.109(1), the Trustee must demonstrate that she accepted the settlement payments from Berkman in good faith and for reasonably equivalent value. In order for Plaintiffs to prevail on their constructive fraudulent transfer claims, they must establish that the Trustee took for less than a reasonably equivalent value.

### 1. Reasonably Equivalent Value

Because the reasonably equivalent value issue is common to all three of the fraudulent transfer claims, the Court will first address that issue. Section 726.104(1), Florida Statutes, states, in part, that

Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred *or an antecedent debt is secured or satisfied....* (emphasis supplied).

■ In this case, Berkman's payment to the Trustee was on account of an antecedent debt, namely his liability to the Trustee on her litigation claims against him, as outlined above. And the Synectic Funds and Alco received their distributions from the Trustee on account of Berkman's antecedent debts to them. Therefore, the Trustee, the Synectic Funds, and Alco have established that they gave value for the transfers they received. To meet the requirement that the value was "reasonably equivalent," courts recognize that the analysis focuses on the benefit actually obtained by the debtor in the transaction. In other words, value is measured from the debtor's point of view, not the transferee's.[49]

■ The question before the Court is the value of the consideration received by Berkman in exchange for his payment of $4,750,000.00. As set forth in the Global Settlement Agreement,[50] in exchange for this payment, Berkman received the following: (i) the dismissal the Trustee's adversary proceeding against Berkman and his wife to avoid and recover fraudulent transfers of property, including Berkman's transfer to himself and his wife as tenants by the entireties of the residence purchased for nearly $4,000,000.00 and now valued by Berkman in his bankruptcy schedules at $2,000,000.00, as well as the artwork and furniture contained therein, over 636,000 shares of stock in EVI Corporation, and a SunTrust Bank account; (ii) the withdrawal of the Trustee's objections to Berkman's claims of exemption,[51] including, *inter alia,* his claim that his residence is exempt as tenancy by the entireties property under 11 U.S.C. § 522(b)(3)(B); (iii) the dismissal of the Trustee's complaint against Berkman and several of his entities to avoid and recover fraudulent transfers related to management rights and fees of various investment funds; (iv) the Trustee's delivery to Berkman of a Trustee's Bill of Sale conveying to Berkman all of the Trustee's rights, title, and interest in and to all of the scheduled assets in the Berkman Case and SAM Case; (v) the vacating of the Synectic

---

49. *In re Phoenix Diversified Investment Corp.,* 2011 WL 2182881, *4 (Bankr.S.D. Fla. June 2, 2011). That determination is made on the specific facts of the case and the circumstances relevant to the transaction. *In re 21st Century Satellite Communications, Inc.,* 278 B.R. 577, 582 (Bankr.M.D.Fla.2002).

50. Berkman Case, Doc. No. 115–1, SAM Case, Doc. No. 61–1.

51. Berkman Case, Doc. No. 50.

Funds judgment that Berkman's debt to them of $25 million is non-dischargeable; (vi) the dismissal of the Synectic Funds' objection to Berkman's discharge; and (vii) payment by one of the Synectic Funds of $97,270.00 and delivery of stock certificates representing 13,000 shares of Well Partner stock to one of Berkman's companies.

■ Despite this lengthy recitation of the value given by the Trustee and the Synectic Funds, Plaintiffs argue that there was little value provided because the underlying judgments against Berkman were worthless and uncollectible. But the satisfaction of those judgments constitutes value under Fla. Stat. § 726.104(1) as a matter of law because legitimate, non-illusory antecedent debts were satisfied.[52] And reasonably equivalent value need not be dollar-for-dollar. For example, in *In re Southmark Corp.*, the court found reasonably equivalent value where a settlement payment of $16,525,000.00 was made and, in exchange, a judgment totaling over $22,000,000.00 was released.[53]

In this case, as a result of the Global Settlement Agreement, Berkman's residence, which he purchased for nearly $4 million and, by his own admission, was worth at least $2 million as of 2009, is now shielded from the Trustee's avoidance action. The value in not losing his homestead could likely, standing alone, support a finding of reasonably equivalent value. The Court concludes that the value of the residence, in conjunction with the other consideration Berkman received under the

Global Settlement Agreement, including the satisfaction of multi-million dollar judgments, the title to his other assets, and his Chapter 7 bankruptcy discharge,[54] is reasonably equivalent to the value of the settlement payments.

Plaintiffs also contend that the interplay between Sections 4.2 and 4.5 of the Global Settlement Agreement, together with the fact that Berkman used third-party investors' monies to fund the settlement, requires the conclusion that the Global Settlement Agreement is now void, such that the Synectic Funds' judgments can be revived and the Trustee may pursue her rights against Berkman. If that were true, then arguably no value was provided to Berkman because all the litigation rights which were purportedly relinquished survive. But Plaintiffs' argument misconstrues the express language and terms of the Global Settlement Agreement.

Section 4.2 of the Global Settlement Agreement states that if Berkman fails to satisfy Section 4.5 of the settlement agreement, the Global Settlement Agreement will terminate and be of no further effect. Section 4.5, in turn, required Berkman's counsel to certify that the source of the funds was Berkman's own compensation and to obtain a judicial finding that Berkman's compensation was derived from a good faith, postpetition transaction. But Section 4.5 does not include language that would allow the Court to undo the settlement or unwind actions that have already been taken. Instead, Section 4.5 merely prescribes the actions that Berkman's at-

---

52. *See Goldberg v. Chong*, 2007 WL 2028792, *6 (S.D. Fla. July 11, 2007) (noting that a transferor may not manufacture an illusory debt merely to satisfy the statute). *Cf. In re Southmark Corp.*, 138 B.R. 820, 830 (Bankr. N.D.Tex.1992) (holding that judgment debtor received reasonably equivalent value when judgment creditor received payment under a

supersedeas bond and subsequently released its judgment).

53. 138 B.R. at 830.

54. At the time, the United States Trustee had not yet filed suit to revoke Berkman's discharge.

torney was to take in connection with obtaining court approval of the Global Settlement Agreement. Berkman's attorney satisfied Section 4.5 when she obtained a finding from the Court regarding the source of Berkman's payments. The fact that the parties, years after this finding and the Court's approval of the Global Settlement Agreement, learned that Berkman used defrauded investors' funds to finance the Global Settlement Agreement does not retroactively negate or invalidate Berkman's attorney's compliance with Section 4.5. The Global Settlement Agreement has been consummated, rights have been relinquished, and reasonably equivalent value has been provided. The default provisions of Section 4.2 are not implicated and there is no basis on which the Court can now find that the Global Settlement Agreement is void.

Because the absence of reasonably equivalent value is a required element of Fla. Stat. §§ 726.105(1)(b) and 726.106(1), the Court finds that Plaintiffs have not met their burden of proof on their constructively fraudulent transfer claims. Therefore, the Court grants summary judgment in favor of the Trustee, the Synectic Funds, and Alco on Plaintiffs' Counts II and III.

### 2. Good Faith

Section 726.109(1), Florida Statutes, provides a defense to claims made under Fla. Stat. § 726.105(1)(a), stating

> A transfer or obligation is not voidable under s. 726.105(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

Having established that Berkman received reasonably equivalent value for the settlement payments he made to the Trustee, in order to prevail on her defense, the Trustee must also establish that she accepted the settlement payments in good faith.

 Because the term "good faith" is not defined by statute, courts apply an objective test to determine if a transferee has acted in good faith.[55] Good faith does not encompass a creditor's acceptance of a transfer for the purpose of aiding the debtor in effectuating a fraud upon his creditors.[56] Accordingly, the relevant question is whether the transferee had either actual knowledge of the debtor's fraudulent purpose or knowledge of such facts or circumstances that would have caused an ordinarily prudent person to make further inquiry which, if performed with reasonable diligence, would have disclosed the transferor's fraudulent purpose.[57] Thus, a transferee may not remain willfully ignorant of facts that would cause him to be charged with notice of the transferor's fraudulent purpose.[58] So if circumstances exist that would put the transferee on inquiry notice as to a debtor's underlying fraud, the transferee will be precluded from asserting the good faith defense.[59]

 To the extent that the Trustee's knowledge that Berkman had defrauded investors in the past was sufficient to require the Trustee to make a reasonably diligent inquiry into the source of payments from Berkman under the Global

---

**55.** *In re Seminole Walls & Ceilings Corp.,* 446 B.R. 572, 596 (Bankr.M.D.Fla.2011).

**56.** *Nelson v. Cravero Constructors, Inc.,* 117 So.2d 764, 766 (Fla. 3d DCA 1960).

**57.** *Wiand v. Waxenberg,* 611 F.Supp.2d 1299, 1319 (M.D.Fla.2009); *In re Evergreen Securi-* ty, Ltd., 319 B.R. 245, 254 (Bankr.M.D.Fla. 2003).

**58.** *Wiand,* 611 F.Supp.2d at 1319.

**59.** *Evergreen Security,* 319 B.R. at 255.

Settlement Agreement, the Court finds that the Trustee satisfied that duty by requiring Berkman's counsel to certify that the source of funds was not an investment fund that was managed for the benefit of third parties and to obtain a finding from the Court that the source of the settlement funds was a good faith, postpetition transaction.

Although Plaintiffs correctly observe that the Court's finding applied only to payments Berkman had made as of the date of the finding and not to the future payments that he was still scheduled to make, as a practical matter, no one—not Berkman's counsel and not the Court—could certify the nature of a future event. Plaintiffs have failed to point to a single event or warning sign that would have put the Trustee on notice that there was a concern regarding the source of the funds. In fact, communications to the Trustee, such as the emails from Berkman's attorney and Berkman's *Emergency Motion for Extension of Time to Fund Global Settlement*,[60] were consistent with the Trustee's understanding that Berkman's source of funds was legitimate.

The totality of the circumstances, as known to the Trustee during the time period in which Berkman was funding the settlement, leads to only one conclusion: the Trustee lacked both actual and constructive knowledge of Berkman's fraud perpetrated against Plaintiffs. She undertook a reasonably diligent inquiry to ensure that no such fraud was occurring. That Berkman is a sophisticated pitchman who, as it turned out, was perpetrating a fraud is beyond the Trustee's control and outside the scope of knowledge with which

she can be charged. Accordingly, the Court finds that the Trustee accepted Berkman's settlement payments in good faith as that term is used in Fla. Stat. § 726.109(1).

Because the Trustee has established both elements of her affirmative defense under Fla. Stat. § 726.109(1), she is entitled to summary judgment on Count I of Plaintiffs' claims for actual fraudulent transfers. And because they are subsequent transferees of the settlement payments, as recipients of the Trustee's distributions in the Berkman Case, the Synectic Funds and Alco are also entitled to rely on the defense afforded in Fla. Stat. § 726.109(1), and the Court likewise grants summary judgment in their favor on Plaintiffs' actual fraudulent transfer claims.

### D. *Count V: Unjust Enrichment*

 To prevail on their claim for unjust enrichment, Plaintiffs must show that (i) they conferred a benefit on the Trustee; (ii) the Trustee has knowledge of the benefit; (iii) the Trustee has accepted or retained the benefit conferred; and (iv) the circumstances are such that it would be inequitable for the Trustee to retain the benefit without paying fair value for it.[61] Where a party obtains a benefit through lawful means, courts will not characterize the circumstances surrounding that party's acquisition of the benefit as being inequitable or unjust.[62]

 A typical unjust enrichment claim involves a plaintiff who directly confers a benefit upon a recipient/defendant. In this case, however, Berkman's action in defrauding Plaintiffs was an intermediate transaction. In cases where a claim for

---

**60.** Exh. No. 108; Berkman Case, Doc. No. 162, ¶ 19.

**61.** *Della Ratta v. Della Ratta*, 927 So.2d 1055, 1059 (Fla. 4th DCA 2006).

**62.** *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1314 (11th Cir.2007).

unjust enrichment is based upon an intermediary's conduct, the recipient/defendant against whom the unjust enrichment claim is asserted is at least generally aware of the relationship between the plaintiff and the intermediary. For example, in *Behm v. Cape Lumber Co.*,[63] a lumber company that provided lumber and trusses to a builder in connection with the builder's construction of the homeowners' new home sued the homeowners for unjust enrichment because it had not been paid by the builder. Even if the homeowners were unaware of the specific identity of the plaintiff lumber company, they were generally aware that lumber was necessary for the construction of their house and would have to be paid for. Thus, the homeowners possessed a degree of general knowledge that some entity was conferring a benefit upon them.

But here, the Trustee was unaware that Berkman had any dealings whatsoever with Plaintiffs and they did not directly confer a benefit upon the Trustee. The Trustee had no knowledge of the true source of the settlement funds until four months after she had made distributions to creditors in the Berkman Case and just before she was prepared to make distributions to creditors in the SAM Case. And even if the Court were to conclude that the Trustee had such knowledge, Plaintiffs' claim for unjust enrichment fails because the Trustee provided value for the benefit conferred by Plaintiffs. As the court stated in *American Safety Insurance Service, Inc. v. Griggs*,[64] "[w]hen a defendant has given adequate consideration to someone for the benefit conferred, a claim of unjust enrichment fails." In *Behm*, the appellate court held that the homeowners' motion for directed verdict on the unjust enrich-

ment claim should have been granted because the homeowners had made all payments that were due under the agreement with their builder. The court refused to impose liability against the homeowners based on the alleged failure of the builder to make full payment to the lumber company. Here, because the Court has found that the Trustee provided reasonably equivalent value to Berkman in exchange for the settlement payments, Plaintiffs cannot prevail on their unjust enrichment claims.

Lastly, Plaintiffs cannot establish that the circumstances surrounding the Trustee's acceptance of the settlement payments from Berkman were unjust. Although Plaintiffs are the victims of Berkman's fraud and it would be inequitable to allow Berkman to profit from his own wrongdoing, that is not the issue presented here. Berkman's wrongs against Plaintiffs have no relationship to the Trustee's acceptance of payment from Berkman, and Berkman's fraud is not attributable to the Trustee. Because the Trustee acquired the settlement payments in a lawful manner, there is nothing inequitable in allowing the Trustee and those to whom she made distributions to retain those payments.[65]

### E. *Count VI: Money Had and Received*

 Plaintiffs' final claim, the common law claim of money had and received, requires Plaintiffs to show that the Trustee received their money as the result of Berkman's fraud and that the circumstances are such that the Trustee should, in all fairness, be required to return the

---

**63.** 834 So.2d 285 (Fla. 2d DCA 2003).

**64.** 959 So.2d 322, 331–32 (Fla. 5th DCA 2007).

**65.** *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d at 1314.

money to Plaintiffs.[66] The claim is properly asserted where a defendant erroneously receives the claimant's money in circumstances where it would be unjust for the defendant to retain the money.[67] While technically an action at law, the claim is based on the equitable principle that "no one ought to be unjustly enriched at the expense of another."[68]

Florida courts have recognized claims for money had and received in a variety of factual circumstances, including when there has been a failure of consideration, money has been paid by mistake, money has been obtained through extortion or coercion, or where the defendant has taken undue advantage of the claimant's situation. The nature of the claim defies rigid factual formulations, and it may be based upon any set of facts "which show that an injustice would occur if money were not refunded."[69]

The law is equally clear, however, that the injustice must arise from the defendant's own actions.[70] In this case, the Trustee has done nothing improper, untoward, or illegal. Accordingly, for the reasons explained above in connection with the unjust enrichment claim, the Court finds that it is not unjust for the Trustee to retain the settlement payments that she lawfully negotiated and received on behalf of creditors in the Berkman and SAM Cases. Without knowledge of Berkman's fraud upon Plaintiffs, the Trustee is also an innocent party, and fairness does not dictate that she be held liable for carrying out her duties. Likewise, the Synectic Funds and Also are also innocent parties.

### F. The Settlement Payments Are Property of the Estate.

Although Plaintiffs did not raise this issue in their complaints, they alternatively argue in their motions for summary judgment that the settlement payments are not property of the estate and, thus, must be returned to them.[71] But their argument is at odds with a plain reading of the Bankruptcy Code, and the cases they cite do not support their position.

First, Plaintiffs appear to argue that their investments with Berkman are not property of the estate because Berkman obtained their funds postpetition. But property of the estate includes any interest in property that a bankruptcy trustee recovers under § 550 of the Bankruptcy Code, as well as any interest in property that the estate acquires postpetition.[72] The Trustee's acceptance of the settlement payments constitutes both a recovery under § 550 (as the settlement of avoidance claims) and an interest acquired postpetition. Accordingly, under the plain language of § 541(a)(3) and(a)(7), the settlement payments are property of the estate.

The three cases Plaintiffs cite are distin-

---

**66.** *In re Standard Jury Instructions—Contract and Business Cases,* 116 So.3d 284, 332 (Fla. 2013).

**67.** *Id.*

**68.** *Sharp v. Bowling,* 511 So.2d 363, 365 (Fla. 5th DCA 1987).

**69.** *Moore Handley, Inc. v. Major Realty Corp.,* 340 So.2d 1238, 1239 (Fla. 4th DCA 1976).

**70.** *Marshall–Shaw v. Ford,* 755 So.2d 162, 165 (Fla. 4th DCA 2000) (*"where the defendant has appropriated the plaintiff's money,* or has taken his property and sold it, a quasi-contract count will lie for money had and received") (emphasis supplied).

**71.** Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 95, pp. 27–29.

**72.** 11 U.S.C. § 541(a)(3) and (a)(7).

guishable. In *In re Newpower*,[73] one of two shareholders of a corporation embezzled money that the other shareholder had loaned to the corporation. After the embezzler filed bankruptcy, the aggrieved shareholder sought relief from the automatic stay to continue prosecuting his claims against the transferees of his embezzled funds. The bankruptcy court granted stay relief with respect to the funds that the embezzler had transferred to third parties directly from the corporate account. But the court denied the request for stay relief with respect to the property that the debtor had purchased with the embezzled funds on the basis that such property constituted property of the estate. On appeal, the Sixth Circuit Court of Appeals held that the property which the debtor had purchased with the stolen funds was property of the estate because, under Michigan law, a thief obtains legal title to the goods purchased. That principle is based on the basic notion that a purchaser acquires whatever title the seller had to give. The court explained "if a thief steals funds and uses them to purchase other property *the owner cannot follow the funds, and he is left to his remedy against the thief.*"[74] In this case, the Trustee is not a mere "transferee" from Berkman; Berkman used the funds to "purchase" the settlement of the Trustee's and the Synectic Funds' claims against him. The court's analysis in *Newpower* does not permit Plaintiffs to recover their investments from the Trustee.

Other courts have recognized an exception to the rule that a thief does not pass good title to stolen property: when *money* comes into the hands of a *bona fide* holder. A good faith seller who obtains stolen funds as consideration for the sale is not subject to the true owner's efforts to recover the funds for itself.[75] Here, the Trustee stands in the shoes of that good faith seller. Acting in good faith, she sold valuable litigation rights in exchange for Berkman's settlement payments. Notwithstanding that those payments ultimately turned out to be made with stolen funds, the Trustee obtained good title to the funds and is insulated from Plaintiffs' efforts to recover the funds.

Both of the other two cases cited by Plaintiff are inapposite. In *In re Mishkin*,[76] the debtor, prior to filing bankruptcy, purchased a condominium with defrauded investors' funds, taking title to the condominium in his own name. The bankruptcy court determined that the condominium was purchased with money that did not belong to the debtor and was not property of the estate. In *Mishkin*, the issue was whether property titled in the debtor's name at the commencement of the case was property of the estate under § 541(a)(1). But in this case, the settlement funds obtained by the Trustee are (i) interests in property recovered under § 550, making them property of the estate under § 541(a)(3); and (ii) interests in property that the estate acquired after the commencement of the case, and thus property of the estate under § 541(a)(7).

In *In re Motor Freight Express*,[77] a factual dispute existed as to whether the

73. 233 F.3d 922 (6th Cir.2000).

74. 233 F.3d at 930 (emphasis supplied) (citation omitted).

75. *See U.S. Securities & Exchange Commission v. Universal Express, Inc.*, 2008 WL 1944803, *3 (S.D.N.Y. Apr. 30, 2008). "Simply put, 'one acting in good faith may obtain title to money from a thief.' " *Id.* (citing *Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1279 (11th Cir.2003)).

76. 138 B.R. 410 (Bankr.S.D.N.Y.1992).

77. 91 B.R. 705 (Bankr.E.D.Pa.1988).

debtor unlawfully retained the proceeds of refund checks from the Internal Revenue Service. Without resolving the factual dispute, the court declined to express an opinion as to whether the funds in question were property of the estate. In *dicta*, the court merely commented that "property stolen or improperly received by a debtor during a bankruptcy cannot be retained by a debtor on the ground that it is property of the estate." [78] This statement would apply if Berkman himself were attempting to retain the funds. It does not apply to the Trustee or to the funds she received in good faith and for reasonably equivalent value.

### G. *Equitable Considerations*

 Finally, Plaintiffs have invoked the Court's equitable powers in requesting the Court to fashion an equitable remedy and, ultimately, to force the Trustee to return the settlement payments to them. But Plaintiffs bear responsibility for their decision to invest with Berkman. A representative of the Langdale Plaintiffs, William P. Langdale, III, testified at deposition that he conducted an internet search of Berkman in April 2012, prior to the Langdale Plaintiffs' initial investments with Berkman. Mr. Langdale reviewed online articles published about Berkman in the Oregon press. In fact, Berkman even disclosed his involvement in the prior civil litigation with the Synectic Funds to Mr. Langdale at an in-person meeting. Yet, Mr. Langdale, an attorney, did not review the litigation docket or inquire further. Instead, Mr. Langdale accepted Berkman's explanation about the prior litigation and was satisfied that his impending in-vestments were aboveboard.[79] And while it is unclear whether the 33 individual investors of the Investment Group had similar interactions with Berkman, it is beyond dispute that the skeletons of Berkman's past were available for public viewing, whereas his fraud upon Plaintiffs was unknown to all involved.

As between the Trustee and the Synectic Funds on one hand, and Plaintiffs on the other, equity favors the Trustee and the recipients of her distributions. Plaintiffs, though innocent victims, were in a position to discover Berkman's previous history of fraud prior to choosing to invest with him. The Trustee, however, did take precautions. Although her precautions proved unsuccessful, the Trustee is an innocent party. The Florida Supreme Court stated long ago "[w]hen one of two innocent parties must suffer through the act or negligence of a third person, the loss should fall upon the one who by his conduct created the circumstances which enabled the third party to perpetrate the wrong or cause the loss." [80] Here, Plaintiffs' lack of, or insufficient, due diligence requires them to bear the loss. Had they been more wary of Berkman's past, they may have been able to avoid becoming victims of his fraud.

This outcome also comports with the equities favoring the Trustee and the Synectic Funds and Alco. It took years of litigation and significant financial expenditures, culminating in a jury trial, for the Synectic Funds to obtain judgments against Berkman and SAM. Alco also obtained a sizeable judgment against Berk-

---

**78.** 91 B.R. at 712.

**79.** Exh. No. 145, pp. 52–53.

**80.** *Inman v. Rowsey,* 41 So.2d 655, 659 (Fla. 1949). *See also Ruwitch v. First National Bank of Miami,* 291 So.2d 650, 652 (Fla. 3d DCA 1974) ("As between two innocent parties suffering from the fraud of a third, the party whose own negligence or misplaced confidence enabled the third party to consummate the fraud must bear the loss").

man in state court. With assistance from the Trustee in negotiating the Global Settlement Agreement, the Synectic Funds and Alco are finally able to recover some of their losses. And the Trustee has worked diligently to fulfill her statutory duty to maximize the recovery for creditors of the Berkman and SAM estates. Valuable rights have been relinquished and positions have changed. Unfortunately for Plaintiffs, they do not hold a superior claim to the funds in question as against other innocent parties. The lesser of two evils requires the Court to reject Plaintiffs' equitable arguments.

### H. Count IV: Injunctive Relief

██ Plaintiffs also seek an order enjoining the Trustee from concluding her administration of the SAM estate and making distributions to SAM's creditors from the funds she has on hand, which Plaintiffs contend includes their investments. In order to obtain an injunction, Plaintiffs must establish that (i) there is a substantial likelihood they will prevail on the merits of their claims; (ii) they will suffer irreparable injury if the injunction is not granted; (iii) such injury outweighs the harm which granting injunctive relief would inflict upon defendants; and (iv) the public interest will not be adversely affected by the granting of an injunction.[81] Failure to show any of the four required factors is fatal, and the most common failure is not showing a substantial likelihood of success on the merits.[82] Such is the case here. Because the Court has determined that Plaintiffs have not prevailed on the merits, the Court will rule for the Trustee on the requested injunctive relief. The Trustee may proceed to distribute the funds on hand in the SAM Case in accordance with her court-approved Notice of Final Report.

### IV. Conclusion

For the foregoing reasons, it is **OR-DERED:**

1. The Trustee's Motions for Summary Judgment (Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 94; Adv. Pro. No. 8:13–ap–469–CED, Doc. No. 75) are GRANTED.

2. The Synectic Funds' Motions for Summary Judgment (Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 97; Adv. Pro. No. 8:13–ap–469–CED, Doc. No. 77) are GRANTED.

3. Alco's Motion for Summary Judgment (Adv.Pro. No. 8:13–ap–336–CED, Doc. No. 96) is GRANTED.

4. The Langdale Plaintiffs' Motions for Summary Judgment (Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 95; Adv. Pro. No. 8:13–ap–469–CED, Doc. No. 76) are DENIED.

5. The Investment Group's Motions for Summary Judgment (Adv. Pro. No. 8:13–ap–336–CED, Doc. No. 98; Adv. Pro. No. 8:13–ap–469–CED, Doc. No. 78) are DENIED.

6. The Court will enter separate judgments in favor of the Trustee, the Synectic Funds, and Alco.

---

81. *In re Alexander SRP Apartments, LLC,* 2012 WL 2339347, *2 (Bankr.S.D. Ga. June 4, 2012) (preliminary injunction); *In re Daytona Beach General Hospital,* 153 B.R. 947, 950 (Bankr.M.D.Fla.1993) (permanent injunction).

82. *American Civil Liberties Union of Florida, Inc. v. Miami–Dade County School Board,* 557 F.3d 1177, 1198 (11th Cir.2009).