# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| **HV JVCO I, LLC,** | ) | |
| | ) | |
| Plaintiff-Counterclaim Defendant, | ) | |
| | ) | |
| | ) | |
| v. | ) | **C.A. No. N22C-12-237 PRW** |
| | ) | **CCLD** |
| **OPEN ON SUNDAY, LLC,** | ) | |
| | ) | |
| Defendant-Counterclaim Plaintiff. | ) | |
| | ) | |

Submitted: January 20, 2026
Decided: April 20, 2026

## DECISION AFTER TRIAL

Neal J. Levitsky, Esquire, Griffin A. Schoenbaum, Esquire, FOX ROTHSCHILD LLP, Wilmington, Delaware; John A. Wait, Esquire, FOX ROTHSCHILD LLP, New York, New York. *Attorneys for Plaintiff-Counterclaim Defendant HV JVCo I, LLC.*

David L. Finger, Esquire, DAVID L. FINGER, ATTORNEY AT LAW, Wilmington, Delaware; Manotti L. Jenkins, Esquire, THE LAW OFFICES OF MANOTTI L. JENKINS, LTD., Chicago, Illinois; William Gray, Jr., Esquire, James M. Gross, Esquire, Langie Cadesca, Esquire, FOLEY HOAG, LLP, New York, New York; Jonathan Bard, Esquire, FOLEY HOAG, LLP, Boston, Massachusetts. *Attorneys for Defendant-Counterclaim Plaintiff Open On Sunday, LLC.*

**WALLACE, J.**

This case concerns music royalties. But it also concerns something more prosaic: names. People often use or are known by different names in different settings—nicknames, middle names, initials, or whatever others happen to call them (for better or worse). Ordinarily, that morphing poses no problem. A variation in name rarely obscures identity.

That's largely so in the music industry, too. Fans and consumers seldom trouble themselves with the legal names of the performers they follow. An artist's public identity may bear only a passing resemblance to the name on a birth certificate; no one is misled by the difference. As well, artists may adopt different names depending on the persona they wish to project. Recognition, not precision, is what matters.

The law can be less forgiving. There are contexts in which a name must be exact. This case presents one of them. Here, the difference between one version of an artist's name and another determines whether a filing is effective and, in turn, which party holds superior claim to certain royalty assets. From that premise, the remainder of the dispute follows.

## I. THE TRIAL

The trial of this case lasted two days and included testimony from four fact witnesses, one expert, and more than 170 documentary exhibits.[1] The central factual

---

[1]   The witnesses in order of appearance were: Cynthia Katz, Sherrese Clarke, Kristen Wilson,

dispute concerns which party holds the superior interest in—and thus the right to own and receive—music royalty assets.

## II. APPLICABLE LEGAL PRINCIPLES AND STANDARDS

The Court has examined all exhibits submitted by the parties and considered the testimony of all witnesses. During trial, the Court applied the Delaware Rules of Evidence to the testimony and the exhibits presented. Consistent with the Court's knowledge of those rules and the specific rulings the Court articulated during both pretrial and trial proceedings, the Court has relied only on the evidence allowed under those rules and rulings in reaching its verdict.

As this was a bench trial, the Court is the sole finder of fact.[2] In turn, the Court has made its own assessment of each witness's credibility and reconciled, to the best of its ability, any inconsistencies in the testimony and documentary evidence.[3] The Court then reviewed and applied the same instructions that it would give a jury in these circumstances.[4]

---

Elliot Hayes, and Harold Thompson. This decision cites to: trial exhibits (by "JX" "CX" "DX" or "PX" number); the trial transcript ("[Day], [Last Name] Tr."); and deposition transcripts ("[Last Name] Dep. Tr.").

[2] *Pouls v. Windmill Ests., LLC*, 2010 WL 2348648, at *4 (Del. Super. Ct. June 10, 2010).

[3] *Pencader Assoc., LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *3 (Del. Super. Ct. June 30, 2010) ("[I]n a bench trial, it is the Court's role to resolve the conflicts in witnesses' testimony and weigh their credibility."); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545–46 (Del. Super. Ct. 2005) (setting forth "the customary Delaware standard" a trial judge applies when assessing trial testimony and evidence in a bench trial).

[4] *See, e.g.*, Del. Super. Ct. Civ. Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or

The Court has remained mindful throughout its deliberations that the party seeking judgment and relief on its pled claim or counterclaim must prove each element thereof by a preponderance of the evidence.[5]

In reaching its verdict, the Court has considered all applicable law—both Delaware's and other relevant states'—and each party's respective arguments—both oral and written—on the merits of the parties' claims, defenses, and the weight to be accorded to witness testimony and other forms of evidence submitted.[6]

## III. FINDINGS OF FACT

Prakazrel Samuel Michel[7]—known to most as "Pras"—rose to prominence as a member of the Fugees, a 1990s hip-hop group, and through his subsequent solo

---

Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony); *id.* at 23.10 (Expert Testimony).

[5]     *Pouls*, 2010 WL 2348648, at \*4; *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2024 WL 1596021, at \*15 (Del. Super. Ct. Apr. 12, 2024), *reargument denied*, 2024 WL 3273427 (Del. Super. Ct. July 2, 2024) ("A party must prove each element by a preponderance of the evidence."); *see Grand Acquisition, LLC v. Passco Indian Springs DST*, 145 A.3d 990, 994 (Del. Ch. 2016), *as revised* (Sept. 7, 2016), *aff'd*, 158 A.3d 449 (Del. 2017) (explicating the preponderance of evidence standard); *see also Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence: "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."); *Newark Shopping Ctr. Owner, L.L.C. v. Saudades Grp., LLC*, 2025 WL 655063, at \*3 (Del. Super. Ct. Feb. 26, 2025) (same).

[6]     The Court may highlight certain facts and legal principles uniquely applicable to this case. But the fact that a certain principle is expressly mentioned here does not indicate that the Court did not consider other legal principles applicable to this case and to the parties' claims and defenses during its deliberations.

[7]     Pras often uses the name "Samuel Prakazrel Michel", but his name is legally "Prakazrel Samuel Michel." *See* Stipulated Facts for Post-Trial Briefs, ¶ 3 (D.I. 113) [hereinafter "Stip. Facts"]; *see also* JX-176 (Pras's Florida Driver's License denoting an expiration date of October 29, 2028); JX-133 (Pras's Florida driving record as of December 8, 2022). Pras was a resident of Florida at all times relevant here. Stip. Facts, ¶ 17.

work.[8]  From that success flowed a steady stream of royalties:  contractual rights to payment tied to recordings that have endured for decades.[9]  Some of those royalty rights—the "Royalty Assets"—are the subject of this dispute.[10]

In the early 2020s, Pras sought to convert those long-term income streams into immediate liquidity.[11]  He first turned to Open On Sunday, a firm in the business of acquiring music assets.[12]  While Pras's initial intent was to sell the rights to his royalties, the deal between Open On Sunday was ultimately recast as a loan.[13]  In January 2022, Pras and Open On Sunday entered into a secured transaction under which Open On Sunday claimed a lien on the Royalty Assets.[14]  In signing those agreements, Pras signed the agreement "Samuel Prakazrel Michel" rather than his legal name "Prakazrel Samuel Michel."[15]

---

[8]    Stip. Facts, ¶ 3, n.1.

[9]    *See, e.g.*, JX-001; JX-002; JX-003; JX-004; JX-005; *see generally* Stip. Facts.

[10]    *See generally* Stip. Facts.

[11]    Oct. 30, 2025, A.M., Elliot Hayes Tr., 9–13.

[12]    Stip. Facts, ¶¶ 1, 6.  For convenience, the Court and parties have and may at times referred to Defendant as OOS.

[13]    The change occurred because of an undisclosed tax lien on Pras's royalties which resulted in Open On Sunday reorienting the deal. Oct. 30, 2025, A.M., Elliot Hayes Tr., 98; *see also* JX-009. Open On Sunday was initially unaware of the tax lien, and as a result converted its purchase agreement offer into a loan. Oct. 30, 2025, A.M., Elliot Hayes Tr., 100–102; *see also* JX-031 (Open On Sunday-Pras Settlement Agreement).

[14]    JX-033 (Asset Pledge and Security Agreement); JX-032 (Secured Note Promissory Note).

[15]    JX-033 (Asset Pledge and Security Agreement); JX-032 (Secured Note Promissory Note). This wasn't abnormal for Pras. Oct. 30, 2025, A.M., Elliot Hayes Tr., 12–13. In fact, in the original royalty agreement at issue between the Fugees and Ruffhouse Records, Inc. Pras signed his name above his social security number as "Samuel Prakazrel Michel." *See* JX-001; *see also* JX-002

To protect that newly minted interest, Open On Sunday filed UCC-1 financing statements.[16] On each of the UCC statements, instead of using Pras's correct legal name—"Prakazrel Samuel Michel"—Open On Sunday used the name "Samuel Prakazrel Michel."[17]

At roughly the same time in late 2021, Pras approached HarbourView.[18] HarbourView was also in the business of investing in music properties,[19] and it was interested in purchasing Pras's Royalty Assets.[20]

On April 4, 2022, HarbourView and Pras signed a letter of intent and began a

---

(signing the same in a 1996 agreement); JX-005 (signing the same in a 2005 agreement).

[16] Oct. 30, 2025, A.M., Elliot Hayes Tr., 28, 108–09; JX-035 (Florida UCC Filing); JX-036 (New York UCC Filing); JX-037 (California UCC Filing); JX-038 (Georgia UCC Filing).

> Mr. Hayes, Open On Sunday's CEO and Cofounder, explained his thinking on this:
>
> Q. Why did you list his name as Samuel Michel, additional name Pras in this UCC-1?
>
> A. That was the name main convention that we had seen since the 1992 recording agreement. It was the naming convention used in all documents executed between Open on Sunday and Pras beforehand, including represented by two separate legal counsels. So that was the name we used.

Oct. 30, 2025, A.M., Elliot Hayes Tr., 30.

[17] Oct. 30, 2025, A.M., Elliot Hayes Tr., 28, 108–09; JX-035 (Florida UCC Filing); JX-036 (New York UCC Filing); JX-037 (California UCC Filing); JX-038 (Georgia UCC Filing).

[18] Oct. 29, 2025, Sherrese Clarke Tr., 210–11. While it's of little consequence to the overall posture and factfinding of the case, Plaintiff HV JVCO I, LLC, is the investment vehicle of a larger "HarbourView" entity. Oct. 29, 2025, Cynthia Katz Tr., 39. But there is no need to conceptually separate them when discussing the facts or the verdict, so the Court uses the name HarbourView to refer to the Plaintiff-Counterclaim Defendant side of this contest.

[19] Stip. Facts, ¶ 2.

[20] Oct. 29, 2025, Cynthia Katz Tr., 42–43.

conventional diligence process.[21] At that time, HarbourView had in its possession a number of documents relating to the Royalty Assets and Pras's prior transaction with Open On Sunday, including agreements in which Pras signed as "Samuel Prakazrel Michel."[22] Those materials included both the contracts generating the Royalty Assets and the loan and security documents between Pras and Open On Sunday.[23]

Later that month and into early May, HarbourView's counsel initiated lien searches.[24] To aid in those searches, Pras's counsel represented that Pras's legal name was "Prakazrel Samuel Michel" and that he did not use any other names.[25] The searches were conducted using the name "Prakazrel Samuel Michel," as well as variations such as "Pras" and "Michel Prakazrel."[26] No search was conducted at that time using the name "Samuel Prakazrel Michel"—the name that Open On Sunday

---

[21] JX-052.

[22] Oct. 29, 2025, Cynthia Katz Tr., 129 (testimony of Cynthia Katz, the Fox Rothschild attorney who primarily handled the transaction):

> Q. HarbourView and Fox Rothschild had in their possession prior to closing the deal with Pras at least 17 documents that Pras had signed using the name Samuel Michel as his name or as an a/k/a. Do you agree?
>
> A. Yes.

*See also* Stip. Facts, ¶ 10.

[23] *See, e.g.*, JX-001; JX-002; JX-003; JX-004; JX-005; JX-032; JX-057; *see* Stip. Facts, ¶ 10.

[24] JX-071; JX-076; JX-091; Oct. 29, 2025, Cynthia Katz Tr., 116–27; Stip. Facts, ¶ 9.

[25] JX-065 (Email from David Wheatley, Counsel for Pras, to Cynthia Katz, Counsel for HarbourView (April 26, 2022) (". . . I wanted to confirm for you the requests made on our call - Pras' legal name is Prakazrel Samuel Michel, he has no aliases, and he is a resident of Florida."); Oct. 29, 2025, Cynthia Katz Tr., 89–94.

[26] JX-071; JX-076; JX-091; Oct. 29, 2025, Cynthia Katz Tr., 116–27.

used for its UCC-1 filing statement.[27] As a result, the searches didn't identify any of the UCC-1 financing statements Open On Sunday had filed.[28]

Through April and into May 2022, HarbourView and Pras continued negotiating the terms of a potential asset purchase agreement.[29] Drafts exchanged during this period included provisions addressing the existing Open On Sunday transaction, including provisions contemplating payment to Open On Sunday at or in connection with closing.[30]

Later in May 2022, HarbourView received from Pras's counsel a document described as a "Second Amendment" to the Open On Sunday-Pras agreements.[31] The document was provided in redacted form, but the amendment purported to be an agreement between Open On Sunday and Pras removing Open On Sunday's interest in Pras's Royalties.[32] HarbourView didn't contact Open On Sunday to verify its legitimacy.[33] Following receipt of that document, the asset purchase agreement no longer included provisions requiring payment to Open On Sunday as a condition of

---

[27] JX-071; JX-076; JX-091; Oct. 29, 2025, Cynthia Katz Tr., 116–27.

[28] JX-071; JX-076; JX-091.

[29] Stip. Facts, ¶ 7.

[30] JX-077, Art. I (draft agreement between Pras and HarbourView (May 10, 2022)) (defining "Offset Amounts" as "expressly includ[ing] all amounts owed by Seller to Open on Sunday . . .").

[31] JX-177; Oct. 29, 2025, Cynthia Katz Tr., 59–63; Stip. Facts, ¶ 14.

[32] Oct. 29, 2025, Cynthia Katz Tr., 59–63; JX-177; Stip. Facts, ¶ 12.

[33] Stip. Facts, ¶ 15.

closing.[34]

On closing day, June 24, 2022, HarbourView's counsel conducted one final UCC search, again without using the name "Samuel Prakazrel Michel."[35] And again, nothing came up.[36] HarbourView and Pras executed the Asset Purchase Agreement.[37]

Following the transaction, a dispute arose concerning the validity and effect of the Second Amendment and the respective interests in the Royalty Assets. On August 23, 2022, Open On Sunday initiated litigation in state court in Fulton County, Georgia against a HarbourView entity and Pras.[38] In that action, Open On Sunday alleged that its security interest in the Royalty Assets was valid and enforceable and asserted claims seeking to invalidate or avoid the transfer of the Royalty Assets, including under the Georgia Uniform Voidable Transactions Act.[39] Open On Sunday eventually abandoned that state court effort.[40]

On October 18, 2022, Open On Sunday filed a second action in the United States District Court for the Northern District of Georgia against Pras, HarbourView-

---

[34] Oct. 29, 2025, Cynthia Katz Tr., 63–64; JX-100.

[35] JX-100; JX-104; Oct. 29, 2025, Cynthia Katz Tr., 128–30.

[36] JX-104; Oct. 29, 2025, Cynthia Katz Tr., 128–30.

[37] JX-100; Oct. 29, 2025, Cynthia Katz Tr., 128–30.

[38] JX-123.

[39] JX-123.

[40] Oct. 30, 2025, A.M., Elliot Hayes Tr., 130–31.

related entities, and others.[41] In that action, Open On Sunday asserted claims including breach of contract, fraud, and violations of the Georgia Uniform Voidable Transactions Act, and alleged that the Second Amendment had been forged.[42] The federal court granted summary judgment in favor of Open On Sunday on its breach of contract claim against Pras and entered a monetary judgment against him.[43] The court granted summary judgment in favor of Pras on Open On Sunday's fraud and Georgia Uniform Voidable Transactions Act claims.[44]

Neither Georgia action resulted in a determination of the ownership of the Royalty Assets nor the relative priority, if any, of HarbourView's and Open On Sunday's respective interests therein.

HarbourView initiated this action seeking declaratory judgment that its Asset Purchase Agreement is not voidable (Count I) and that Open On Sunday lacks any basis to interfere with its right to receive the royalties (Count II).[45] Open On Sunday answered and asserted counterclaims seeking declaratory judgment that the purported Second Amendment is invalid (Count I), that its UCC-1 filings are valid (Count II), and that HarbourView and Pras violated Section 276 of the New York Debtor and

---

[41] JX-131.

[42] JX-131.

[43] JX-169. HarbourView was dropped from the federal case via consent order. *See* Resp. to Mot. to Dismiss Ex. 2 (D.I. 10).

[44] JX-169.

[45] D.I. 1.

Creditor Law (Count III).[46]  Following pretrial motions, the Court dismissed Count III of Open On Sunday's counterclaims on the ground that New York law had no applicability here.[47]

## IV. THE PARTIES' CONTENTIONS

### A. OPEN ON SUNDAY'S CONTENTIONS

Open On Sunday argues that it—not HarbourView—holds the superior claim to the Royalty Assets because its lien remained valid and was never released.[48] According to Open On Sunday, the "Second Amendment" that supposedly extinguished its lien was a forgery by Pras, and Florida's Uniform Fraudulent Transfer Act ("FUFTA") permits courts to set aside fraudulent transfers.[49]  It argues HarbourView either knew enough or ignored enough warning signs that it cannot qualify as a good-faith purchaser for value, and therefore, FUFTA would apply (along with other theories).[50]  Open On Sunday emphasizes that HarbourView had actual knowledge of Open On Sunday's lien, failed to search under the name Pras used in

---

[46]  D.I. 19.  According to Open On Sunday, Pras owed it $6.5 million under its "loan" agreements and had obtained a $6.5 million secured interest in the Royalty Assets through those same "loan" agreements with Pras. *See, e.g.* OOS's Post-Trial Op. Br. at 8–10 (D.I. 111). The federal district court in Georgia entered a monetary judgment in the amount of $6.5 million for Open On Sunday and against Pras. JX-169.

[47]  D.I. 72; May 19, 2025, Motion Tr. at 72–82 (D.I. 89).

[48]  *See generally* OOS's Post-Trial Op. Br.; OOS's Post-Trial Ans. Br. (D.I. 117).

[49]  OOS's Post-Trial Op. Br. at 7–32; OOS's Post-Trial Ans. Br. at 14–30.

[50]  OOS's Post-Trial Op. Br. at 7–32; OOS's Post-Trial Ans. Br. at 14–30.

key contracts, accepted suspicious and contradictory documents at face value, and did not perform the follow-up diligence that would have exposed the fraud.[51] On that basis, Open On Sunday asks the Court to declare the Second Amendment void, hold that HarbourView took its interest subject to Open On Sunday's preexisting lien, and grant relief restoring Open On Sunday's priority position in the royalty stream.[52]

## B. HARBOURVIEW'S CONTENTIONS

HarbourView argues that it holds the superior interest in the Royalty Assets because it purchased those assets through an arm's-length deal, paid fair value, and properly perfected its interest by filing under Pras's correct legal name.[53] HarbourView argues that this case is simply resolved: it perfected first under Florida's UCC, and therefore, it owns the Royalty assets free and clear.[54] HarbourView further contends that Open On Sunday cannot argue other theories beyond UCC perfection because such issues were never pleaded and are precluded by prior Georgia litigation.[55] In any event, HarbourView maintains it acted in good faith and paid reasonably equivalent value, defeating any such claim.[56] Finally, HarbourView

---

[51] *See generally* OOS's Post-Trial Op. Br.; OOS's Post-Trial Ans. Br. at 14–30.

[52] OOS's Post-Trial Op. Br. at 47–49.

[53] *See generally* HV's Post-Trial Op. Br. (D.I. 110); HV's Post-Trial Ans. Br. (D.I. 118).

[54] HV's Post-Trial Op. Br. 30–48.

[55] HV's Post-Trial Op. Br. at 16–26; HV's Post-Trial Ans. Br. at 3–21.

[56] HV's Post-Trial Op. Br. at 27–30; HV's Post-Trial Ans. Br. at 21–29.

argues the Court need not decide whether the disputed "Second Amendment" was forged because that issue would not affect priority, and therefore judgment should be entered in HarbourView's favor on all claims and counterclaims.[57]

## V. ANALYSIS AND LEGAL FINDINGS

Each party must prove the elements of its respective claims and defenses by a preponderance of the evidence.[58] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[59] And whichever is that "side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."[60]

The Court ultimately finds in HarbourView's favor. *First*, applying Florida's Article 9, the Court must conclude that Open On Sunday failed to perfect its security interest because its financing statement did not comply with Florida's strict debtor-name requirements, while HarbourView did properly perfect its interest. Accordingly, HarbourView holds a superior interest in the royalties, free and clear of

---

[57]  HV's Post-Trial Op. Br. at 48–52.

[58]  *Surf's Up Legacy Partners*, 2024 WL 1596021, at *15 ("A party must prove each element [of its claim] by a preponderance of the evidence.").

[59]  *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002).

[60]  *Reynolds*, 237 A.2d at 711; *Newark Shopping Ctr. Owner*, 2025 WL 655063, at *3.

Open On Sunday's claim. *Second*, the Court considers Open On Sunday's alternative theories, and finds on the merits that—even were a fraudulent transfer assumed— HarbourView took the assets in good faith and for reasonably equivalent value, such that the transfer is not voidable. *Third,* because that good-faith-for-value determination is dispositive, the Court concludes that all Open On Sunday's remaining theories fail as well; each depends on the same contention the Court has rejected. *Finally*, the Court declines to reach the validity of the purported Second Amendment because, regardless of its validity, the outcome remains unchanged. Consistent with these determinations, judgment is entered in favor of HarbourView on its claims and the relevant counterclaims.

### A. OPEN ON SUNDAY DIDN'T PERFECT ITS INTEREST IN PRAS'S ROYALTIES; HARBOURVIEW DID; THEREFORE, HARBOURVIEW HAS FREE AND CLEAR OWNERSHIP UNDER ARTICLE 9 OF THE UCC.

The Court starts with the result yielded by a strict application of Article 9's rules governing perfection and priority. That result serves as an anchor for the analysis that follows. The parties dispute certain facts and advance additional arguments and defenses that could affect the outcome. But those issues are easier to assess once the Court identifies what the statutory framework requires on its own terms.

Under that straightforward application, Open On Sunday did not comply with the Florida UCC's perfection requirements under that state's law and therefore did

not perfect its interest.  HarbourView did.  Under Article 9's priority rules, that means HarbourView holds the superior interest in the collateral, free and clear of Open On Sunday's claim.

### 1.  Florida Law governs this Article 9 dispute.[61]

UCC Article 9, as enacted by the states, provides a defined choice-of-law framework for resolving perfection disputes.[62]  That framework directs the Court to apply the law of the jurisdiction in which the debtor is located.[63]  Thus, the local law of that jurisdiction governs questions of perfection, its effect, and priority.[64]  In this case, the parties have stipulated that the debtor, Pras, was at all relevant times a resident of Florida and that Article 9 of the Florida UCC applies.[65]  As a result, the

---

[61]  After the commencement of this litigation, Florida's UCC was revised. The revised code provides that such revisions don't apply to actions commenced before July 1, 2025. FLA. STAT. ANN. § 669.701(3) (West 2025). Thus, the Court will only cite to those Florida statutes that were operative during the times relevant to this suit.  The Court further notes that while it cites to the 2022 version of these statutes, each statute has been verified to be in effect for the entirety of this litigation up until the aforementioned revisions became operative.  All that said, Florida's 2025 revisions appear to have little to do with any substantive aspect of this litigation. *See* FLA. CIV. JUST. & CLAIMS SUBCOMMITTEE, H.B. 515 (2025), Staff Analysis (May 27, 2025), https://flsenate.gov/Session/Bill/2025/515/Analyses/h0515z1.CIV.PDF.

[62]  U.C.C. § 9-301 (Am. Law Inst. & Unif. Law Comm'n 2026).

[63]  U.C.C. § 9-301 cmt.4 (Am. Law Inst. & Unif. Law Comm'n 2026) ("Paragraph (1) contains the general rule: the law governing perfection of security interests in both tangible and intangible collateral, whether perfected by filing or automatically, is the law of the jurisdiction of the debtor's location, as determined under Section 9-307."); *In re SemCrude L.P.*, 864 F.3d 280, 292 (3d Cir. 2017) (same); FLA. STAT. ANN. §§ 679.3011, 679.3071 (West 2022); *see also* DEL. CODE ANN. tit. 6, §§ 9-301, 9-307 (2025).

[64]  FLA. STAT. ANN. § 679.3011 (West 2022); *see also* DEL. CODE ANN. tit. 6, § 9-301 (2025).

[65]  Stip. Facts, ¶ 17; *see generally* HV's Post-Trial Op. Br.; OOS's Post-Trial Op. Br.; May 19, 2025 Hearing on Cross-Motions for Summary Judgment Tr., 8 (D.I. 77):

THE COURT:          So [Counsel], why don't you tell me where you land on

Court finds that Florida law governs the issues of perfection and priority presented in this matter as related to Article 9 of the UCC.

## 2. Florida has a zero-tolerance rule regarding perfection of security interests.

It is, as a general matter, bad business to acquire property without a working understanding of liens and the attachment of security interests. It bears emphasizing that a security interest comes into existence through attachment—that is, through a bargained-for exchange in which a creditor extends value, the debtor acquires or holds rights in the collateral, and the parties memorialize their agreement (typically in a security agreement) such that the creditor obtains a legally cognizable interest in the property.[66] Upon attachment, the agreement becomes an interest in the collateral itself such that when the debtor transfers the collateral, the security interest ordinarily travels with it.[67]

---

|  | which statute applies. Is this under the Florida UCC? |
| --- | --- |
| OOS's COUNSEL: | Your Honor, . . . I'm happy to report that all parties now agree on that point, so we begin with an issue of agreement. |

[66] FLA. STAT. ANN. § 679.2031(2) (West 2022); *Westlake Flooring Co., LLC v. Miami Motorsports, LLC*, 423 So. 3d 894, 900 (Fla. Dist. Ct. App. 2025) ("A security interest in collateral is enforceable against the debtor, along with third parties, when: (1) value has been given; (2) the debtor has rights in the collateral or the power to transfer collateral rights to a secured party; and (3) the debtor has signed a security agreement that describes the collateral, among other unrelated options."); *see also Cannon v. Romeo Sys., Inc.*, 2025 WL 2848069, at *21 (Del. Ch. Oct. 7, 2025).

[67] FLA. STAT. ANN. § 679.322 (West 2022); *Rayfield Inv. Co. v. Kreps*, 35 So. 3d 63, 65 (Fla. Dist. Ct. App. 2010) ("The Florida UCC explicitly provides that a perfected security interest in goods takes priority over all subsequently perfected and unperfected security interests in the same goods.").

But the attachment-reality creates an obvious problem for would-be purchasers: Those interests are not apparent at the point of sale, but they may nonetheless bind unaware purchasers of property.[68] The law doesn't leave that problem unsolved. All states have implemented some form of the UCC's Article 9[69] which requires that interest holders may only maintain their interests if they provide notice thereof to the public.[70]

That process is known as perfection.[71] Under Florida law, this is accomplished in most cases by filing a UCC-1 financing statement that complies with the requirements of Florida's adoption of the UCC.[72] And completion of the filing is paramount because "[t]he UCC priority scheme is purely a race provision—first in time, first in line."[73]

Florida's statute specifies what a financing statement must contain to be

---

[68] *Bramble Transp., Inc. v. Sam Senter Sales, Inc.*, 294 A.2d 97, 103 (Del. Super. Ct. 1971), *aff'd*, 294 A.2d 104 (Del. 1972) ("The purpose of a financing statement is to put a searcher on notice[.]").

[69] Ryan E. Bull, *Operation of the New Article 9 Choice of Law Regime in an International Context*, 78 TEX. L. REV. 679, 684 n.13 (2000).

[70] *1944 Beach Boulevard, LLC v. Live Oak Banking Co.*, 346 So. 3d 587, 591 (Fla. 2022) (noting that the UCC requires secured parties to provide public notice of their interests in order to maintain them).

[71] *WSFS v. Chillibilly's, Inc.*, 2005 WL 730060, at *4 (Del. Super. Ct. Mar. 30, 2005) ("When addressing disputes concerning secured transactions, generally, the first secured creditor to file or perfect an interest in collateral has priority over other secured creditors in the distribution of collateral or its proceeds.").

[72] FLA. STAT. ANN. § 679.322 (West 2022) (enumerating exceptions); *Westlake Flooring Co.*, 423 So. 3d at 900 ("In most cases, a financing statement must be filed to perfect all security interests.").

[73] *Nat'l Bank of Sarasota v. Dugger*, 335 So. 2d 859, 860 (Fla. Dist. Ct. App. 1976).

effective.  The statute states, "[A] financing statement is sufficient only if it: (a) Provides the name of the debtor; (b) Provides the name of the secured party or a representative of the secured party; and (c) Indicates the collateral covered by the financing statement."[74]

Because the filing system is indexed by debtor name, that element carries particular significance; thus, the statute prescribes how exactly a filer must input the debtor's name.[75]  And the statutory scheme of Florida "places the burden to correctly name the debtor on the filer of a financing statement."[76]  For an individual debtor with an unexpired Florida driver's license, the financing statement must use the name exactly as it appears on that license.[77]  Section 679.5031 states this explicitly:

(1)  **A financing statement sufficiently provides the name of the debtor**:

*             *             *

(d)  . . . if the debtor is an individual to whom this state has issued a driver license that has not expired or to whom the agency of this state that issues driver licenses has issued, in lieu of a driver license, a personal identification card that has not expired, **only if the financing statement provides the name of the individual that is indicated on the driver**

---

[74]  FLA. STAT. ANN. § 679.5021(1) (West 2022).

[75]  FLA. STAT. ANN. § 679.5031(1) (West 2022); *see generally 1944 Beach Boulevard*, 346 So. 3d at 589.

[76]  *1944 Beach Boulevard*, 346 So. 3d at 593.

[77]  FLA. STAT. ANN. § 679.5031(1)(d) (West 2022); *see also id.* at § 679.5031(1)(e) ("If the debtor is an individual to whom paragraph (d) does not apply, only if the financing statement provides the individual name of the debtor or the surname and first personal name of the debtor").

**license** or personal identification card;[78]

For any errors in the name, the statute discusses "Effect of errors or omissions" under Section 679.5061:

(1) A financing statement substantially complying with the requirements of this part is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading.

**(2) Except as otherwise provided in subsection (3), a financing statement that fails sufficiently to provide the name of the debtor in accordance with § 679.5031(1) is seriously misleading.**

(3) If a search of the records of the filing office under the debtor's correct name, **using the filing office's standard search logic**, if any, would disclose a financing statement that fails sufficiently to provide the name of the debtor in accordance with § 679.5031(1), the name provided does not make the financing statement seriously misleading.

(4) For purposes of § 679.508(2), the term "debtor's correct name" as used in subsection (3) means the correct name of the new debtor.[79]

Reading the statutes together, under Section 679.5031(d) and Section 679.5061(1)–(2), if the filer of the statement fails to use the debtor's name on his Florida driver's license (or equivalent), then the filing is seriously misleading and ineffective.[80] But as seen above, 679.5061(3) on its face provides a safe harbor: An error may be

---

[78] FLA. STAT. ANN. § 679.5031(1)(d) (West 2022) (emphasis added).

[79] *Id.*; *id.* at § 679.5061.

[80] *Id.* at § 679.5061(1)–(2).

excused if a search under the incorrect name would still disclose the filing.[81]

To illuminate the proper read of these statutes, the Court turns to Florida law. And most instructive in this instance is the Florida Supreme Court's *1944 Beach Boulevard, LLC v. Live Oak Banking Co*. decision with its explanation of that state's statutory scheme and its workings.[82]  In *1944 Beach Boulevard*, a lender extended credit secured by a blanket lien on a debtor's assets and sought to perfect that interest by filing UCC-1 financing statements.[83]  Those filings, however, identified the debtor as "1944 Beach Blvd., LLC," rather than its full legal name, "1944 Beach Boulevard, LLC."[84]  When the debtor later filed for bankruptcy, it challenged the effectiveness of those filings, arguing that the name deviation rendered the financing statements "seriously misleading" under Florida law.[85]  The lender responded that the error was minor and should be excused because the filings could still be located by navigating

---

[81]  *Id.* at § 679.5061(3).

[82]  346 So. 3d 587 (Fla. 2022).  This case has been widely discussed by academics for its unique effect on Florida's Article 9 scheme. *See e.g.* Lynn M. LoPucki, *The Florida-UCC Filing System Disaster*, 76 FLA. L. REV. 723 (2024); Mark J. Wolfson, *The Florida UCC Filing System-A Concern, Not A Disaster: A Response to Professor Lynn M. Lopucki*, 76 FLA. L. REV. 22 (2024).

[83]  *1944 Beach Boulevard*, 346 So. 3d at 589–90.

[84]  *Id*.

[85]  *Id*.; *see* FLA. STAT. ANN. § 679.5061(2) (West 2022).  Under federal law, a debtor in possession can assume the position of a hypothetical lien creditor to avoid unperfected liens and security interests through the "strong-arm" powers granted by Section 544 of the Bankruptcy Code. *See* 11 U.S.C. § 544; *In re NRP Lease Holdings, LLC*, 20 F.4th 746, 750 (11th Cir. 2021), *certified question answered and remanded sub nom. 1944 Beach Boulevard, LLC v. Live Oak Banking Co.*, 346 So. 3d 587 (Fla. 2022).

the registry's search results.[86]

Focusing on the structure of Section 679.5061, the Court explained that subsection (3)—which permits certain naming errors to be excused—applies only if a search of the filing office's records, using the office's "standard search logic," would disclose the financing statement.[87] The Court then examined Florida's Secured Transaction Registry and concluded that it doesn't employ "standard search logic" as that term is used in Article 9.[88] Because the statutory safe harbor depends on the existence of such search logic, and none exists in Florida's system, the Court held that subsection (3) couldn't be invoked.[89] That leaves subsection (2) as governing. And so, a financing statement that fails to correctly provide the debtor's name, as required by Section 679.5031, is "seriously misleading" and therefore ineffective.[90]

The practical consequence is simple. Unless and until the registry implements

---

[86] *1944 Beach Boulevard*, 346 So. 3d at 589 (the lender relied on *In re NRP Lease Holdings*: "Live Oak asserted in its answer to Beach Boulevard's complaint the affirmative defense that 'its financing statements substantially complied with Florida law and that abbreviating 'Boulevard' to 'Blvd.' was a minor error or omission that does not render the financing statements defective or seriously misleading.' Live Oak also 'claimed that the filing statements were not 'seriously misleading' because they can be found within one page of the initial search results.' In support, Live Oak explained that 'while its liens do not appear on the first page of results for a search in the Registry under '1944 Beach Boulevard, LLC,' the search results are displayed in alphabetical order and 'merely clicking the blue '<<PREVIOUS' tab one time' will reveal the existence of its liens.'").

[87] *1944 Beach Boulevard*, 346 So. 3d at 593.

[88] *Id.*

[89] *Id.* ("Because the Registry lacks a 'standard search logic,' the search contemplated by section 679.5061(3) is impossible, which means that filers are left with the zero-tolerance rule of section 679.5061(2).").

[90] *Id.*; *see* FLA. STAT. ANN. § 679.5061(1)–(2) (West 2022).

a qualifying search function, the statutory scheme functions as a "zero-tolerance" rule.[91]  Though unforgiving and tending toward some harsh results at-present, under Florida's UCC, a financing statement must comply precisely with the debtor-name requirements set forth in Section 679.5031(1).  Any deviation—however slight—can render the filing "seriously misleading" and leave the security interest unperfected.

### a. As a result of Florida's *1944 Beach Boulevard* Zero-Tolerance Rule, Open On Sunday failed to perfect under Florida's Article 9 while HarbourView did so.

The Court turns to the issue at hand and begins with Open On Sunday's conduct.  In February 2022, Open On Sunday entered into its lending relationship with Pras and obtained a security interest in the Royalties through its loan and security documents.[92]  No doubt, Open On Sunday's interest attached at execution.[93]  From that point forward, Open On Sunday bore the burden of perfecting its interest in accordance with Florida's Uniform Commercial Code.[94]  It didn't.

Open On Sunday attempted to do so by filing its error-bearing UCC-1

---

[91]  Wolfson, *The Florida UCC Filing System-A Concern, Not A Disaster*, 76 FLA. L. REV. at 22 n.3.

[92]  JX-031.

[93]  HV's Post-Trial Op. Br. 36–48; FLA. STAT. ANN. § 679.2031 (West 2022); *see also id.* at § 679.322; *Westlake Flooring Co.*, 423 So. 3d at 900.

[94]  *In re NRP Lease Holdings*, 20 F.4th at 752, *certified question answered and remanded sub nom. 1944 Beach Boulevard*, 346 So. 3d 587 (Fla. 2022) (citing FLA. STAT. ANN. § 679.5011 (West 2021)) ("To perfect a security interest, **a creditor must file** a 'financing statement' with the Registry." (emphasis added)); *see also* FLA. STAT. ANN. § 679.3171 (West 2022).

financing statement on February 2, 2022.[95] That filing failed to strictly comply with Florida's statutory requirements because it didn't list the debtor's name exactly as it appears on his unexpired Florida driver's license.[96] In turn, in Florida's eyes, Open On Sunday's filing was "seriously misleading" and legally ineffective from the moment it was filed.[97] As a result, Open On Sunday remained an unperfected secured party.

Then, HarbourView entered the picture. After Open On Sunday had failed to perfect its interest, HarbourView negotiated and executed an Asset Purchase Agreement with Pras.[98] In that transaction, HarbourView provided value to Pras.[99] And Pras retained ownership rights in the Royalties with the power to transfer the collateral to HarbourView.[100] Once ownership transferred, HarbourView perfected

---

[95] JX-035 (Florida UCC filing).

[96] JX-035 (Florida UCC filing); Stip. Facts, ¶ 3; JX-176 (Pras's Florida Driver's License).

[97] *Compare* JX-035 (Florida UCC filing); Stip. Facts, ¶ 3; JX-176 (Pras's Florida Driver's License) *with 1944 Beach Boulevard*, 346 So. 3d at 593; FLA. STAT. ANN. § 679.5031(1)(d) (West 2022).

[98] JX-100; Oct. 29, 2025, Cynthia Katz Tr., 128–30.

[99] JX-100.

[100] FLA. STAT. ANN. § 679.2031(2) (West 2022); *Westlake Flooring Co.*, 423 So. 3d at 900 ("A security interest in collateral is enforceable against the debtor, along with third parties, when: (1) value has been given; (2) the debtor has rights in the collateral or the power to transfer collateral rights to a secured party; and (3) the debtor has signed a security agreement that describes the collateral, among other unrelated options."). All elements of attachment were met here: HarbourView purchased the Royalties for $5,000,000. *See* JX-100. Open On Sunday cannot dispute that Pras owned those royalties nor say that he was unable to transfer them under the UCC. *See generally* Stip. Facts; OOS's Post-Trial Op. Br.; Oct. 30, 2025, A.M., Elliot Hayes Tr., 127–129 (agreeing that Open On Sunday was a secured lender); JX-031 (Lender Agreements Between Open On Sunday and Pras).

its interest.[101]  Thusly, under Florida law, HarbourView had a perfected interest; Open On Sunday didn't.

### 3. Under the strict application of Florida's Article 9, HarbourView has a superior interest free and clear of Open On Sunday's.

"[O]ne of the most important roles the UCC plays is facilitating the efficient procession of commerce by permitting parties to rely in good faith on the plain terms of authorized public filings. The UCC thus enables the crafting of contractual arrangements that generate wealth and the investment of capital in commercial enterprise because parties are able to rely on a clear and predicable set of rules to govern their transactions."[102]  A subset of these predicate rules are those governing priority.  In Florida, like many other states, "[i]t is black letter law that an unperfected security interest is subordinate to a perfected security interest."[103]

Here, HarbourView's interest is superior to Open On Sunday because HarbourView complied with the requirements for perfection and Open On Sunday didn't.  Article 9 mandates that HarbourView's interest take priority.  Thus, under Florida's strict application of Article 9, HarbourView takes clear of Open On Sunday's interest.

---

[101]  FLA. STAT. ANN. § 679.3091 (West 2022).

[102]  *Off. Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1016–17 (Del. 2014) (internal citations omitted).

[103]  *Suburbia Fed. Sav. & Loan Ass'n v. Bel-Air Conditioning Co.*, 385 So. 2d 1151, 1153 (Fla. Dist. Ct. App. 1980); FLA. STAT. ANN. § 679.322 (1)(b) (West 2022) ("A perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien.").

**B. HARBOURVIEW WAS A GOOD-FAITH PURCHASER FOR REASONABLY EQUIVALENT VALUE—THUS, ALL OTHER DEFENSES AND ARGUMENTS FAIL.**

The Parties' dispute doesn't end at the straightforward application of Florida's UCC. Open On Sunday advances a series of alternative theories—grounded in Florida statutory law (FUFTA), the common law, and the UCC itself—under which it contends its interest remains superior notwithstanding any defect in perfection. Although these theories vary doctrinally, they share a common premise: that HarbourView cannot claim ownership over the Royalty Assets because it wasn't a good-faith purchaser that paid a reasonably equivalent value.[104] Each theory turns on the assertion that HarbourView either acted with knowledge of Pras's alleged misconduct or failed to provide adequate consideration for the royalty assets. None work.

The Court addresses Open On Sunday's arguments in sequence. It first rejects HarbourView's procedural objections that such alternative arguments cannot be considered. The Court next concludes that—under the FUFTA and even assuming a fraudulent transfer—HarbourView took the royalty assets in good faith and for reasonably equivalent value, so the transfer is therefore not voidable. Finally, because that determination is dispositive, the Court concludes that Open On Sunday's theories fail, as each depends on the same already-rejected contention.

---

[104] *See generally* OOS's Post-Trial Op. Br.

## 1. Open On Sunday's Fraudulent-Transfer Theory isn't procedurally barred.

From the outset, Open On Sunday has sought to circumvent a traditional perfection analysis by advancing alternative statutory theories under which its interest would purportedly remain valid.[105]  Initially, those theories were grounded in New York's Fraudulent Conveyance Law.[106]  New York law has been deemed inapplicable.[107]  Now, Open On Sunday's position relies on the Florida Uniform Fraudulent Transfer Act (FUFTA).[108]  HarbourView opposes that shift, contending that the FUFTA claim is procedurally barred under this Court's rules—specifically Rules 16(e) and 15(b)—and, in any event, is independently precluded by res judicata on the ground that the relevant issues were, or should have been, litigated in the prior Georgia action.[109]

The res judicata argument fails.  In Georgia,[110] like many states, preclusion

---

[105]  Answer and Counterclaim at 42–44 (D.I. 19) (citing a violation of Section 276 of the New York Debtor and Creditor Law).

[106]  Answer and Counterclaim at 42–44.

[107]  May 19, 2025, Motion Tr. at 72 (D.I. 89).

[108]  May 19, 2025, Motion Tr. at 72–73 ("THE COURT: . . . Everybody now agrees that actually . . . proper statutes would be Florida's UCC provisions and that they apply to the present dispute because of Pras's residence in Florida at the time and that HV is invoking the Florida UVTA's good-faith defense to its argument—or to OOS's argument supporting voiding that APA with Pras.").

[109]  HV's Post-Trial Op. Br. at 16–25.

[110]  This Court must look to the preclusion law of the state in which that federal court sits. *Semtek International Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001); *Pyott v. Louisiana Mun. Police Emps.' Ret. Sys.*, 74 A.3d 612, 615–16 (Del. 2013).  The parties agree and the Court finds that Georgia law applies here. HV's Post-Trial Op. Br. at 21; OOS's Post-Trial Op. Br. at 43.

requires an adjudication on the merits in the prior case.[111] That didn't happen in the prior suit.[112]

Further, Open On Sunday's reliance on FUFTA isn't barred by Rules 16(e) or 15(b). Open On Sunday has consistently advanced the substance of a fraudulent-transfer theory directed at the validity and voidability of HarbourView's acquisition of the royalties; what changed was the statutory fit, not the underlying theory. The Court had already determined that New York's fraudulent conveyance statute was inapplicable, but that ruling did not excise a transfer-act analogue from the case. To the contrary, at summary judgment the parties and the Court expressly recognized that the relevant transfer-law framework, if any, was Florida law, including HarbourView's asserted good-faith defense.[113] In that posture, the Court doesn't find

---

[111] *QOS Networks Ltd. v. Warburg, Pincus & Co.*, 531, 669 S.E.2d 536, 540 (Ga. Ct. App. 2008) (citing *Brown v. J.H. Harvey Co.*, 601 S.E.2d 808, 810 (Ga. Ct. App. 2004)).

[112] JX-169. The Georgia federal court was in an unusual posture with respect to the FUFTA-adjacent theory. By the time the case reached summary judgment, HarbourView was no longer a party, leaving only Pras and Open On Sunday before that court. The claim was dismissed against Pras because Open On Sunday didn't continue asserting it. In that posture, although the theory had been pled and dismissed, it was not resolved on the merits. That is the critical point. The claim depended on HarbourView's involvement in the challenged transfer, and without HarbourView, there was no party against whom the theory could operate and no relief the court could award on that basis. The court therefore proceeded to resolve the case on the claims that remained—principally the breach-of-contract and fraud claims against Pras—and entered judgment on those grounds alone. Because the fraudulent-transfer theory was never brought to a decision on its substance, the prior action didn't produce a merits determination of that issue to which preclusive effect could attach. *Cf. Verrastro v. Bayhospitalists, LLC*, 208 A.3d 720, 728 (Del. 2019) ("[A] dismissal can be 'on the merits' as it concerns the viability of another suit against the dismissed party without having a collateral effect on a potentially responsible third party.").

[113] May 19, 2025, Motion Tr. at 72–82.

that the FUFTA arrived as a wholly new issue after trial. The same core facts, the same transaction, and the same good-faith and value questions were already before the Court. Whatever imprecision attended Open On Sunday's labeling of the theory, the Court does not find the kind of unfair surprise or prejudice that Rules 16(e) and 15(b) are designed to prevent.

### 2. HarbourView's interest is valid under FUFTA because it purchased the Royalty Assets in good faith and for reasonably equivalent value.

Open On Sunday's principal argument proceeds under the FUFTA.[114] It contends that HarbourView cannot take the Royalty Assets because the transfer from Pras was made with fraudulent intent and is therefore voidable under that statute.[115] In Open On Sunday's view, Pras sought to hinder or defraud a creditor, and resultingly, HarbourView is not entitled to FUFTA's protection because it allegedly took with knowledge of that scheme and paid less than reasonably equivalent value.[116] On that theory, Open On Sunday says, it would have superior rights in the royalties under Florida law.

Under the FUFTA, a transfer made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor" is subject to avoidance.[117] "To prevail on a

---

[114] *See generally* OOS's Post-Trial Op. Br.

[115] *See generally id.*

[116] *See generally id.*

[117] Fla. Stat. Ann. §§ 726.105(1)(a), 726.108 (West 2022).

fraudulent transfer claim, a creditor must demonstrate (1) there was a creditor to be defrauded, (2) a debtor intending fraud, and (3) a conveyance—i.e., a 'transfer'—of property which could have been applicable to the payment of the debt due."[118]  But proof that a creditor was defrauded under the statute isn't enough.[119]  A transfer "is not voidable" when the subsequent purchaser "took in good faith and for a reasonably equivalent value[.]"[120]  For the purposes of this analysis, the Court accepts that Pras attempted to hinder, delay, or defraud Open On Sunday.  Thus, the Court must determine whether HarbourView satisfies those two elements—good faith and reasonably equivalent value.  It does.

### a. HarbourView took in good faith.

"Good faith" is an affirmative defense—thus, during trial, it was HarbourView's burden to prove.[121]  As often noted by Florida courts, "good faith" isn't defined and thus an objective test is used to find it or its absence.[122]  "[T]he relevant question is whether the transferee had either actual knowledge of the debtor's

---

[118]  *Recovery Agents, LLC v. Tutko*, 399 So. 3d 1281, 1283 (Fla. Dist. Ct. App. 2025) (quoting *Isaiah v. JP Morgan Chase Bank*, 960 F.3d 1296, 1302 (11th Cir. 2020)).

[119]  FLA. STAT. ANN. § 726.109 (West 2022).

[120]  *Id.*

[121]  *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1319 (M.D. Fla. 2009); *Perlman v. Five Corners Invs. I*, 2010 WL 962953, at *3 (S.D. Fla. Mar. 15, 2010); *see* FLA. STAT. ANN. § 726.109 (West 2022).

[122]  *In re Berkman*, 517 B.R. 288, 303 (Bankr. M.D. Fla. 2014); *Waxenberg*, 611 F. Supp. 2d at 1319; *Wiand for EquiAlt LLC v. Adamek*, 2023 WL 5226670, at *6 (M.D. Fla. Aug. 15, 2023); *Puck v. Silverman*, 2024 WL 3540662, at *6 (S.D. Fla. June 11, 2024); *see also Sample v. Hundred Lakes Corp.*, 145 So. 193, 196 (Fla. 1932).

fraudulent purpose or knowledge of such facts or circumstances that would have caused an ordinarily prudent person to make further inquiry which, if performed with reasonable diligence, would have disclosed the transferor's fraudulent purpose."[123] And willful ignorance is no excuse.[124] HarbourView has met its burden.

Consider first the lien searches. HarbourView conducted repeated UCC searches during diligence and again at closing. Open On Sunday's interest never turned up. Why? Open On Sunday failed to perfect its interest under Florida law because it used a Pras alias rather than his legal name. On the other hand, when searching, HarbourView did use Pras's legal name and some of his aliases—just not the one that Open On Sunday wished HarbourView had used.[125]

It is true that HarbourView had in its possession multiple transaction documents depicting Pras's name as "Samuel Prakazrel Michel," which is the name Open On Sunday used in its UCC filings.[126] It is also true that HarbourView did not

[123] *In re Berkman*, 517 B.R. at 303; *Wiand for EquiAlt*, 2023 WL 5226670, at *6 (same); *Langdale Capital Assets, Inc. v. Woodard*, 517 B.R. 288, 303 (Bankr. M.D. Fla. 2014).

[124] *Wiand for EquiAlt*, 2023 WL 5226670, at *6; *In re World Vision Ent., Inc.*, 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002*); Langdale Capital Assets*, 517 B.R. at 303; *In re Mongelluzzi*, 587 B.R. 392, 411 (Bankr. M.D. Fla. 2018). "Because establishing actual intent through direct proof is difficult, the [F]UFTA looks to circumstantial indicia of intent commonly known as 'badges of fraud.'" *Mane FL Corp. v. Beckman*, 355 So. 3d 418, 425 (Fla. Dist. Ct. App. 2023). Those factors focus on objective circumstances the statute identifies as relevant to fraudulent intent including, among other things, the timing of the transfer, the debtor's insolvency, concealment of assets, and pending or threatened litigation. FLA. STAT. ANN. § 726.105(b).

[125] JX-071; JX-076; JX-091; Oct. 29, 2025, Cynthia Katz Tr., 116–27.

[126] *See, e.g.*, JX-033 (Asset Pledge and Security Agreement); JX-032 (Secured Note Promissory Note); JX-001; *see also* JX-002 (signing the same in a 1996 agreement); JX-005 (signing the same in a 2005 agreement); JX-035 (Florida UCC Filing); JX-036 (New York UCC Filing); JX-037

run a search under that exact formulation, and that such a search might have revealed Open On Sunday's filing. From that line of thinking, Open On Sunday ultimately asks that HarbourView be held responsible for not searching the wrong name simply because it's a name that an interest holder could have used. That is a difficult position to square with Florida's statutory scheme that makes the debtor's correct legal name a zero-tolerance requirement for perfection.[127] The Court finds that HarbourView's failure to search every incorrect variation it may have access to does not negate the significance of what it actually did: it repeatedly searched for interests using the correct legal name confirmed by counsel and as expressly required by Florida law.

Second, consider what HarbourView did with the information it actually had. Whatever the lien searches did or did not show, HarbourView was aware from its diligence materials that Open On Sunday had an interest in the Royalties. And it did not ignore that fact or try to paper it over. Indeed, it did the opposite. From the outset, HarbourView considered Open On Sunday's interest, and early drafts of the transaction included provisions contemplating a direct payoff of that obligation at closing.[128]

_____

(California UCC Filing); JX-038 (Georgia UCC Filing).

[127] *See generally 1944 Beach Boulevard*, 346 So. 3d 587. The *1944 Beach Boulevard* decision was months away while the HarbourView-Pras transactions were occurring. But the reality it explains could answer whether a reasonably prudent person would have searched "Samuel Prakazrel Michel" when the law requires "Prakazrel Samuel Michel."

[128] JX-077, Art. I (draft agreement between Pras and HarbourView (May 10, 2022)) (defining "Offset Amounts" as "expressly includ[ing] all amounts owed by Seller to Open On Sunday . . .").

Then, HarbourView received from Pras's counsel a document described as a "Second Amendment" to the Open On Sunday agreements.[129] The version provided was redacted, but it indicated that Open On Sunday's interest in the Royalty Assets had been released.[130] HarbourView reviewed that document as part of its diligence and proceeded on the understanding that no enforceable lien remained. Today, Open On Sunday identifies aspects of that document that it characterizes as irregular: the redactions, certain imprecise language, and the timing of its delivery.[131] Those features, it argues, should have resulted in some sort of inquiry on HarbourView's part. Not so.

The document was transmitted through counsel in the ordinary course of negotiations similar to all the documents submitted before it and addressed a known issue in a manner consistent with the evolving structure of the transaction.[132] Furthermore, the errors and redactions within the document don't result in any indicia of falsity that would lead an ordinary prudent person to question its authenticity.

---

[129] JX-089 (Email from Ed Papraro, Counsel for Pras, to Cynthia Katz, Counsel for HarbourView (May 24, 2022)); Oct. 29, 2025, Cynthia Katz Tr., 58–59; JX-177 (Second Amendment).

[130] JX-177 (Second Amendment); Oct. 29, 2025, Cynthia Katz Tr., 58–59.

[131] *See generally* OOS's Post-Trial Op. Br.; JX-177 (Second Amendment).

[132] Oct. 29, 2025, Cynthia Katz Tr., 58–59. The document was also—essentially—transferred in the same manner as the other diligence documents, including the First Amendment: JX-020 (Open On Sunday-Pras APA); JX-031 (Open On Sunday-Pras Settlement Agreement); JX-033 (Asset Pledge and Security Agreement); JX-032 (Secured Note Promissory Note); JX-057 (First Amendment to the Asset Pledge and Security Agreement). Oct. 29, 2025, Cynthia Katz Tr., 45–46, 63–64.

And the remaining circumstances—Pras's financial distress, his criminal issues, the pace of the negotiations, and the contractual limitations on publicity—don't alter the Court's conclusion.[133] HarbourView was aware that Pras had multiple difficulties.[134] But the Court doesn't find that HarbourView had actual knowledge of Pras's purported fraudulent purpose.[135] Or that it encountered red flags sufficient to put a reasonably prudent person on inquiry notice and would have led to its discovery.[136]

Open On Sunday's theory of bad faith rests on a cluster of facts that, taken together, are meant to suggest that HarbourView should have paused and asked more questions: a counterparty with financial and legal troubles, inconsistent naming across documents, and a late-stage amendment that eliminated a previously assumed lien.[137] But the legal standard is not whether HarbourView could have been more

---

[133] Be assured, these are factors that the Court has considered in its analysis. *Cf. Mane FL Corp.*, 355 So. 3d at 425 ("Courts may consider, among other factors, whether: . . . (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. (j) The transfer occurred shortly before or shortly after a substantial debt was incurred. . . ."); FLA. STAT. ANN. § 726.105(b) (West 2022).

[134] Oct. 29, 2025, Cynthia Katz Tr., 50 (discussing Pras's criminal issues); 43–43, 72 (discussing Pras's tax issues).

[135] *See Orlando Light Bulb Serv., Inc. v. Laser Lighting & Elec. Supply, Inc.*, 523 So. 2d 740, 744 (Fla. Dist. Ct. App. 1988) ("Knowledge that the seller is indebted to another or even knowledge of the existence of a valid and pending cause of action against the seller is insufficient to show the purchaser's participation in a fraudulent conveyance.").

[136] *See Villamizar v. Luna Cap. Partners, LLC*, 260 So. 3d 355, 359 (Fla. Dist. Ct. App. 2018) (holding that an arm's-length purchaser has no duty to investigate or ensure payment of a seller's creditors based solely on knowledge of their claims).

[137] *See generally* OOS's Post-Trial Op. Br.

exacting. It is whether HarbourView encountered facts that would have caused a reasonably prudent purchaser to investigate further and, through that investigation, discover fraud. These facts don't get there.

Could HarbourView have done more? Sure, it could have. But the good-faith inquiry doesn't ask whether HarbourView pursued every conceivable line of inquiry. It asks whether HarbourView ignored facts that would have led a reasonably prudent purchaser to discover fraud. It didn't. That is the line the good-faith defense draws, and HarbourView remained on the permissible side of it.

### b. HarbourView acquired the assets for reasonably equivalent value.

After the good-faith analysis, the Court next considers whether HarbourView paid "reasonably equivalent value" under FUFTA.[138] "To determine whether a debtor received reasonably equivalent value in exchange for a transfer, the Court must determine the value of what was transferred and compare it to what was received."[139] "By its terms and application, the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange."[140] The inquiry focuses on the economic substance of the transaction and its circumstances.[141] Ultimately, a fair

---

[138] FLA. STAT. ANN. § 726.109(1).

[139] *In re Mongelluzzi*, 587 B.R. at 404, *on reconsideration in part sub nom. In re Able Body Temp. Servs., Inc.*, 2018 WL 11206122 (Bankr. M.D. Fla. Sept. 4, 2018).

[140] *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007); *In re Mongelluzzi*, 587 B.R. at 404 (same).

[141] *See generally In re Mongelluzzi*, 591 B.R. 480 (Bankr. M.D. Fla. 2018); *Waxenberg*, 611 F. Supp. 2d 1299; *Arbor Grove Dev., LLC v. ECS1, Inc.*, 425 So. 3d 699 (Fla. Dist. Ct. App. 2025),

exchange like that of an arms-length deal will satisfy the reasonably equivalent value standard.[142]

The Court has carefully considered the parties' arguments, the documentary record, and the expert testimony. Open On Sunday suggests that HarbourView underpaid given: (1) the reduction from an earlier $8.25 million proposal to a $6 million purchase price; and (2) that HarbourView obtained more assets even while reducing its purchase price—most notably obtaining the song *Ghetto Supastar*.[143] Those arguments pale in the light of the full record.

The evidence shows that the reduction in price was related to a narrowing of

---

*reh'g denied* (Dec. 18, 2025); *Perlman v. Am. Express Centurion Bank*, 2021 WL 2598139 (S.D. Fla. Mar. 31, 2021).

[142] *See Villamizar*, 260 So. 3d at 360.

[143] OOS's Post-Trial Op. Br. at 31–32; HV's Post-Trial Ans. Br. at 26–29. Oct. 30, 2025, A.M., Elliot Hayes Tr. 123–24:

> Q. Based on your testimony. Open on Sunday paid approximately $5.1 million for both the Fugees-related and solo artist royalties. Correct?
>
> A. Yes. We paid $5.1 million for the purchase of those assets and extended a repurchase right along with that. Yes.
>
> Q. And approximately one year later HarbourView paid $6 million for just the Fugees royalty rights. Correct?
>
> A. Not correct. . . . [(Counsel asks for explanation)] . . . . Your Asset Purchase Agreement that you showed yesterday included works that weren't part of the Fugees works and the analysis that was done by FTI includes works that are not just the Fugees works. For the analysis you showed for what the value was was a larger basket of works that also included your APA. So seemingly you purchased all the works but are only claiming to have purchased the Fugees works[, for example, *Ghetto Supastar*].

*See also* JX-30 (FTI Valuation of Pras's Share of the Fugees catalog); *compare* JX-020 (Open On Sunday-Pras APA) *with* JX-100 (HarbourView-Pras APA).

purchased assets and further negotiation.[144]  The reduction wasn't any failure of consideration, and the additions of a small number of Pras's solo works were simply additions as part of that deal—not a larger scheme to defraud Open On Sunday. Moreover, the contingent earnouts tie a portion of the consideration to the future performance of the royalty stream which reinforces that the parties calibrated the price to future anticipated value of the assets in a commercially reasonable way.[145]

There is very little to question about valuation.[146]  HarbourView paid reasonably equivalent value for the assets obtained.  No doubt, a higher price might always be paid.  But the FUFTA does not require the Court to determine a single "correct" price or to second-guess a negotiated outcome with the benefit of hindsight. The question is whether the consideration was reasonably equivalent, not whether it was optimal.[147]  The Court finds that it was by a preponderance of evidence.[148]

### 3. Open On Sunday's related defenses are similarly resolved.

The Court's conclusion that HarbourView acted in good faith and paid

---

[144] Oct. 29, 2025, Cynthia Katz Tr. 43–44, 193–194; Oct. 29, 2025, Sherrese Clarke Tr. 214–217; Oct. 29, 2025, Kristen Wilson Tr. 287–292.

[145] *See* JX-100 (HarbourView-Pras APA) (obtaining earnouts based upon performance in the sum of $750,000).

[146] *See* JX-030.

[147] FLA. STAT. ANN. § 726.109(1) (West 2022).

[148] The dispute concerning *Ghetto Supastar* doesn't alter this conclusion. Open On Sunday's characterization that the song was somehow undervalued just isn't persuasive.  At most, it reflects a disagreement about valuation within a larger portfolio transaction, which the Court finds insufficient to establish a lack of reasonably equivalent value in this instance.

reasonably equivalent value doesn't doom just Open On Sunday's FUFTA theory. It is dispositive of Open On Sunday's remaining arguments as well. Although those arguments are framed under different legal doctrines, each ultimately depends on the same contention—that HarbourView should not receive the protections afforded to a good-faith purchaser for value.[149] Having rejected that contention, the Court necessarily rejects other arguments contrary to that finding. Whether framed through common law rules governing title, statutory avoidance principles, or concepts embedded in the UCC, the required analysis inexorably turns on whether a transferee took without notice of a competing claim and provided value for the interest received.[150] That issue is resolved. Accordingly, because HarbourView satisfies the good-faith-for-value standard, Open On Sunday cannot prevail under any of its alternative theories.

---

[149] Open On Sunday advances two alternative theories alongside its FUFTA claim. First, it contends that, under the common law, HarbourView could not obtain a superior interest in the assets unless it qualifies as "an innocent purchaser for valuable consideration[.]" OOS's Post-Trial Op. Br. at 15 (citing *United States v. Lavin*, 942 F.2d 177, 185 & n.11 (3d Cir. 1991)). Second, it argues that, under the UCC, a purchaser generally takes subject to any superior interest, but acknowledges that "[t]he only possible exception here is the good faith purchaser exception—i.e., the very same affirmative defense available under Florida common law and FUFTA." OOS's Post-Trial Op. Br. at 19. Accordingly, the Court's analysis converges with Open On Sunday's framing: resolution of the FUFTA issue necessarily resolves these alternative theories as well.

[150] As one commentator posits: "The UCC affords judges more independence than does a civil-law commercial code. Rather than preempt the field entirely, the UCC specifically invites judges to supplement its provisions with 'principles of law and equity.' To accept this invitation, judges must be able not only to understand non-UCC principles but also to discern when resort to those principles is necessary." Steven L. Harris, *Using Fundamental Principles of Commercial Law to Decide UCC Cases*, 26 Loy. L.A. L. Rev. 637, 637 (1993) (internal citations omitted).

## C. THE COURT NEED NOT DECIDE THE VALIDITY OF THE "SECOND AMENDMENT."

The Declaratory Judgment Act vests the Court with *discretion* to grant declaratory relief.[151] "The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, will not terminate the uncertainty or controversy giving rise to the proceeding."[152] "Delaware courts will . . . not issue declaratory relief when it can have no practical effect on the injury complained of."[153] And our Supreme Court has provided the elements which must be met before a court will intervene in a dispute and offer relief by declaratory judgment:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[154]

Here, the validity or invalidity of the purported Second Amendment to the

---

[151] DEL. CODE ANN. tit. 10, §§ 6501, 6505, 6506 (2025).

[152] *Id.* at § 6505; *In re COVID-Related Restrictions on Religious Servs.*, 302 A.3d 464, 493 (Del. Super. Ct. 2023), *aff'd*, 326 A.3d 626 (Del. 2024); *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *12 (Del. Ch. July 14, 2008) ("For a court to exercise declaratory judgment jurisdiction, there must be an "actual controversy[.]").

[153] *In re Peierls Fam. Inter Vivos Trusts*, 77 A.3d 249, 268 (Del. 2013); *In re COVID-Related Restrictions on Religious Servs.*, 302 A.3d at 493.

[154] *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989); *see also Manchester v. Narragansett Cap., Inc.*, 1989 WL 125190, at *10 (Del. Ch. Oct. 19, 1989); *Band's Visit National Tour LLC v. Hartford Fire Ins. Co.*, 307 A.3d 387, 422 (Del. Super. Ct. 2023).

Open On Sunday-Pras loan agreement isn't contested by HarbourView.[155]  Indeed, HarbourView has made clear that it has no interest nor need to champion that document's validity.[156]  Put simply, resolution of whether the proffered Second Amendment is valid isn't necessary to the disposition of this case.  Even assuming the Second Amendment was ineffective to release Open On Sunday's lien, the outcome would remain unchanged.  The parties' competing claims to the Royalty Assets turn on the application of Florida's UCC Article 9 and FUFTA, irrespective of whether the lien was extinguished or remained imperfectly in place.[157]

Because a declaration regarding the Second Amendment's validity wouldn't alter the parties' rights or resolve the underlying dispute, it would serve no practical

---

[155]  HV's Post-Trial Op. Br. at 49–50 ("HV has not taken a position on whether the signature on the Second Amendment was 'forged' but instead maintains it acted in good faith in believing OOS authorized the Second Amendment when HV received it.").  *See Band's Visit*, 307 A.3d at 422 (noting that: "Prior to entertaining a declaratory judgment action, the Court must first make a threshold determination that an 'actual controversy' exists.").

[156]  HV's Post-Trial Op. Br. at 49–50 ("Importantly, HV need not contest the Second Amendment's validity because HV's security interest is superior irrespective of the Second Amendment.").

[157]  To be sure, Open On Sunday's theory places both Pras's alleged fraudulent intent and the validity of the purported Second Amendment at the center of its FUFTA analysis.  Those issues could bear on whether a fraudulent transfer occurred in the first instance.  But the Court need not resolve them here.  Even assuming that the transfer was effected through Pras's fraud—including that the Second Amendment was invalid or forged—Open On Sunday still can't obtain relief.  The Court finds that HarbourView had no part in such alleged devious acts.  Again, HarbourView has established that it took the assets in good faith and for reasonably equivalent value. In that posture—while perhaps it would add a fascinating sidelight—any further determination on the existence or mechanism of the alleged forgery wouldn't alter the outcome and would amount to an unnecessary adjudication of merely interesting and incidental issues.  Were such findings truly required to resolve the parties' rights, the Court would take on that task.  But the Declaratory Judgment Act does not require the Court to decide questions that have no practical effect on the disposition of the case.

purpose.[158]  The Court therefore declines to decide whether the Second Amendment was indeed authentic or artifice.

## VI.  CONCLUSION AND VERDICT

Consistent with the foregoing, judgment is entered in favor of HarbourView on Counts I and II of its Complaint, which seek declaratory relief that its Asset Purchase Agreement is not voidable and that HarbourView's perfected security interest entitles it to the Royalties.

The Court declines to enter declaratory judgment on Count I of Open On Sunday's Counterclaims—which seeks a declaration that the purported Second Amendment is invalid—because resolution of that issue is unnecessary to the disposition of this case.  Judgment is entered in favor of HarbourView on Counts II and III of Open On Sunday's Counterclaims, which challenge the validity of Open On Sunday's UCC filings and seek to avoid the transfer under New York law and like statutes.

The parties are instructed to prepare a form of final order of judgment consistent with this decision and submit it for entry by May 8, 2026.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*
Paul R. Wallace, Judge

---

[158] *See Band's Visit*, 307 A.3d at 422 (explaining:  "But not all disputes . . . are appropriate for a declaration when the parties request it. . . . The Court has discretion to decline declaratory judgment jurisdiction, and will do so where a proposed declaration would not advance the litigation, but rather, would waste judicial resources." (cleaned up)).